Hughes, S. J.
We have given to the various questionsarising in-this cause the careful consideration which the extent of the interests involved required at our hands; and, having arrived at conclusions satisfactory to ourselves, we proceed to state those conclusions, premising that we do not propose to take up the various questions made by the numerous assignments of error in the order of assignment, or, indeed, in any order with reference to such assignments ; but, as tiie examination which wo have made and the conclusions at which we have arrived will necessarily dispose of all the important questions arising in the court below and in this court, we will consider as questions of importance ouly those which the counsel have considered worthy of argument; and when those have been disposed of, our duty will be considered as performed. With these preliminary observations, we proceed, and start with the inquiry—
1. What is the true interpretation of tiie instrument sued on ? Is it evidence of a contract of sale or of-mortgage? This inquiry, by the manner in which we state theproposilion, is confined to an examination of the instrument itself, without a resort to testimony aliunde. \
Tiie instrument is signed by John P. Coles only; sets forth that on that day he laid settled all accounts with Stephen F. Austin, on which settlement he was indebted to said Austin, in the sum of eight hundred and fifty-eight dollars and thirty-eight cents. A debt was then duo by Coles to Austin, the ascertainment. of which had been the object of the settlement; and, after being so ascertained, the next inquiry between tiie parties w.ottld naturally be, what is to be done with tills ascertained debt? Is it to be now paid in money or property, or is it to be secured and paid in future? Tlie.se questions are answered by the instrument by the use of these words: “Which I agree to pay by the half of a grant of land on tiie Yegua and Brazos; ” not that he will secure the payment by the land, but that he will pay — discharge—the debt with the property mentioned; nor is the present tense used, I do hereby pay by or with the land, hut he agrees hereafter to pay.
Here it is insisted that, there being an acknowledgment of a pre-existing debt, and that acknowledgment being tiie evidence of the debt, tiie debt may he sued for aud recovered, notwithstanding the agreement; and that these two circumstances are evidence that t'he instrument was intended as a security for the payment of money, and, notwithstanding the literal interpretation of the instrument would make it a contract of sale, because of the object and intent, It will be converted into a mortgage; and to maintain this proposition, the reasoning of Chief Justice Marshall is referred to, in Conway’s Ex’rs v. Alexander, 2 Cond. R. S. C. U. S., 479; 7 Cr. R., 218.
In that case, the contest between the parties was, whether tiie instrument, upon tiie construction of which the right of either party depended, was a sale of property, defeasible by the payment of money at a future day, or a mortgage — not whether it was a contract of sale without defeasance, or a mortgage; and in such a case the attention of the court could only be directed to the considerations which should and ought properly to induce the belief that *66 the one or the other kind of contract was intended ; and in this inquiry, Chief Justice Marshall properly directs his intention to the inquiry, whether the money mentioned in the conveyance in (rust under his consideration was secured to bo paid, and whether an action could have been maintained to recover it. He found no covenant for its payment, or anything else conducing to show that it might he recovered, and came to the conclusion that an action could not be maintained for its recovery, and (he instrument was determined not to be a mortgage; and we see not what other influence this case should have, further than in so far as it is an enumeration of some of tiie. indicia, of a mortgage. The circumstances of that ease were in no respect those in this, as furnished by the instrument under consideration.
It is true that, in order to ascertain whether a given contract is or is not one of mortgage, the fact Chat the sum of money mentioned as the consideration of the contract is a precedent debt, is of great weight in arriving at a correct conclusion; hut this is generally in cases in which, upon the instrument itself, there appears to have been a sale, and, by testimony aliunde, it is sought to convert it into a mortgage; then, when it is ascertained that it is a precedent debt, and there intervenes other circumstances, and other elements are found, tending to show the true nature of the agreement, and that tiie object was tiie security of the debt, as soon as that object is ascertained, the instrument will be treated accordingly, and decreed to lie a mortgage. This result, however, is arrived at by ascertaining the real intention of the parties, and ruling in accordance with that intention, however that intention might have been concealed under the forms of particular instruments of different description. As to the instrument under consideration, we are endeavoring to arrive at its true interpretation, not by evidence aliunde, but by the terms of the instrument itself.* So far as examined, tiie evidence of the true intention of the parties is strong; but that intention will be made still more manifest should it be ascertained that an action could not have been maintained to recover the debt acknowledged.
Tiie acknowledgment, as it lias been seen, is of the existence of a debt which is agreed to be paid in a particular manner by one half of a tract of land. Suppose Coles to liave been sued for tiie debt, and the instrument in question liad been offered in evidence to prove tiie debt, would tiie debt have been proved in such manner as to authorize the recovery? We think not, because tiie same instrument which ascertained the debt also provided for its payment in a particular manner, and the acceptance by the creditor of the agreement offered by tiie debtor must necessarily lie an extinguishment of the old obligation; otherwise, there would be two obligations in force at the same time, binding on the debtor, and to he discharged by him, when the rule of the law under which tiffs contract was made is, that when there are two obligations founded upon the same canse, and the second is different from the first, and both subsisting', the creditor may use that which he desires, and by moans of the election of tiie one, the debtor is discharged from the other, (ó Febrero, p. 220, sec. Í3.) If the debtor, by tiie election to use the agreement under consideration, lias discharged the debt, it follows that an action cannot be maintained upon anything hut the instrument received in discharge of the precedent debt.
But. it may be said that in arriving at tiffs conclusion we looked beyond the instrument for the purpose of ascertaining whether the instrument lias been accepted. This is only true in appearance; for the existence of the other obligation is only capable of being proved by its possession by the creditor; and when offered in evidence proves, as well as the debt, the manner of its payment, and also the acceptance of it by the creditor; otherwise, it would not he found in his custody.
But whether an action could or could not he maintained to recover the money mentioned in the instrument, can in no manner whatever, in our view, affect the question as to whether the contract was or not a mortgage— there being other parts of tiie writing not yet brought in review, ancl which *67 have an important bearing in settling the question. In the subsequent part of the instrument, it is stipulated that the part allotted to Austin is to be equal in quantity to that which "I retain ; ” again. I agree to let said Austin “have the half,” &c., when speaking of the two labors purchased of Hope; again, speaking of the land sold to Hope, it is said, if that should fall within the “half set apart to Austin; ” again, the “half set apart to Austin,” &c.; and, again, no deduction to he made from “my half.” Why all this particularity, if nothing but a mortgage was intended ? Why speak of “ letting Austin have,” “Austin half,” and my “ my Half? ” No other reason can be given than that of a fixed determination, a settled purpose, to sell to Austin, and thereby divest himself of one Half of the property, and vest it in Austin, and, at the same time, to settle the principles upon which the partition was to he made; and, at the same time, avoid all difficulty about the lands which had been sold lo Hope. Those considerations operate on our minds with conclusive force, and lead us to the conclusion that the instrument under consideration was only intended for a contract of sale. Having ascertained the true interpretation of the instrument, we will now inquire—
2. Is there anything in the testimony from which we can come to the conclusion that, though the writing sued on has ail the characteristics of a contract of sale, it was in fact given to secure a debt, and was consequently a mortgage?
We find nothing in the testimony leading to such a conclusion, hut everything tending in an opposite direction. We have the receipt given by Coles to the executor of Austin, in which lie acknowledges the receipt of taxes paid by him on land “ sold ” to Austin. He acknowledges having liad a settlement with Austin, to one of the witnesses, and that lie had sold the land to Austin. In an answer filed by him and sworn to, he treats the transaction as a sale; and in all the pleas filed during his life by counsel, it is considered in the same light. All tliis could not have been, had the transaction been in fact a mortgage. When first called upon, when sued, and under all circumstances, and at all times, it would have been treated, insisted upon, and proclaimed to have been, and only to have been, a contract of mortgage. But the counsel for appellant in the court below, on the trial, asked the court to instruct the jury, in substance—
That if they found that the instrument sued on was executed in consideration of a precedent debt, and that the sum of money mentioned as the consideration was grossly inadequate to the value of the land set out in the instrument, that inadequacy of itself raises the presumption of mortgage.
And this proposition is attempted to he maintained in this court, and is pressed with the usual ingenuity and ability of the counsel who assumes its paternity. To its truth, we cannot accord our assent. In the broad terms in which it is asserted, it is, in our view, incapable of demonstration. If asked to he viewed in that light, when connected with other circumstances, a ready assent to its truth might he given. In the common-law authors, gross inadequacy of price is treated as conclusive evidence of fraud, while in that system of jurisprudence by which this contract in question is to bo adjudicated, to it is applied the term lesion, indicating the loss which has been sustained by the failure to have received the just price. And lesion is said to supervene when the price is less than half the true value, when it is called lesion inorme; and where greatly less than half, then it is inormisima. But in neither case is a want of tlie just price any evidence of fraud; but the contract will be rescinded unless the just price be paid. We see no rule in the authorities in either system of jurisprudence, either that of the common law, or that of the civil law of Spain, which, by reason of lesion in the one, or fraud in the other, induced by the grossly inadequate price, will convert a contract or agreement of one character or description into that of another. Such a rule of mutation has not come under our observation; no authorities have been produced to maintain it; and we cannot see the force of the application of the reasons which are given to enforce it.
*68 3. Again, in another respect, what is the character of tlie instrument sued on ? Is it an executed or executory coutract?
It is attempted to be maintained that, if a sale at all, it is a sale in presenil, passing the title from Coles, tlie vendor, to Austin, the vendee, from its date; and, consequently, there was no necessity to harass the defendant Coles in his lifetime, nor his representatives since his death, with a suit in reference to its enforcement — the court having- no power to enforce specific execution where the contract was already executed.
To settle this question, a resort is to he had to the rules of the Spanish law.
The contract under consideration, by its terms, comes within tlie range of the class of contracts which is termed the contract of purchase and sale, as to which it is said :
“ The words purchase and sale (compra y venta) are correlative, and denote a contract in which two individuals agree, the one to give to the other a certain thing' for a determinate price. I-Ie who gives the thing, we call the vendor, and lie acquires the action of sale, which is the right which belongs to him, to claim the contract price. He who gives the price, we call the purchaser, who has in his favor the action of purchase, in virtue of which he claims the thing purchased. These rights arise at tlie moment of the completion of tlie contract; but neither tlie vendor can maintain his action, without having' first delivered the tiling, nor the purchaser, without having delivered the price,” (3 Febrero, p. 5, sec. 2;) and it is complete by the consent of both parties. (Id., p. 7, sec. 3; 1 White’s Recop., 185.)
It is a contract, and the contract is complete, and the sale is perfect by the consent of the parties; but while cither the price or the tiling sold yet remains undelivered, the thing sold to the purchaser, and the price to the vendor, though the right is complete to a right of action in each to recover the tiling sold or the price, there is yet no right in the thing sold; and until this right fs_ vested by delivery of the possession, tlie dominion is not vested, and neither tlie vendor nor the purchaser lias that for which they contracted, and their rights under the contract are imperfect.
These propositions will be made manifest by a reference to the Spanish authors. By them there is said to be a distinction between, 1st, a right in tlie thing', and, 2d, a right to tlie tiling. The former is the power that belongs to a man in a certain and determinate thing, without reference to any person ; the latter, on tlie contrary, is the power that a person has against another to oblige him to give, or make for him, anything. Of the right to tlie thing, there is but one species, and that is obligation; but of tlie rig-lit in the thing, there are various. Four are generally enumerated, dominion, &e. (1 White’s Re-cop., 341.) Dominion, when full, is defined to be the right in a corporal thing, from which arises the power of disposition and of claiming it from others. (1 White’s Recop., 342.) But how is dominion to be acquired? Here again, to be understood, another distinction must be observed between the title and tlie mode of acquiring dominion. Ail dominion has two causes, proximate and remote. Remote, is tlie title which vests a right to the tiling and gives cause of action against the vendor who has not delivered the thing sold; and proximate, is the obtaining possession by delivery of the thing sold, which, without anything else, being preceded by the title, vests tlie right in the tiling, which is the dominion. The consequence is, that tlie right to tlie thing gives a personal action, and the right in the thing gives the right of action against any possessor. It serves, then, for a general rule, that the title never gives a right in tlie tiling, or, what is tlie same, the dominion, unless delivery be joined -with it; consequently, neither is title sufficient without delivery, nor delivery without title. (1 White’s Recop., 342, 343, 344, 345.) And tlie same author states the rule, that tlie contract of purchase and sale is a title suitable, if preceded by delivery of the thing sold, to give the dominion. (Id., 345.)
Tlie purchase-money was made upon the making this contract, be *69 cause it was a precedent debt; but the property sold was not delivered, either naturally or symbolically. The dominion, then, was not vested, but the right of the purchaser, at the time of the purchase and sale, existed only in action, and he had a right to his action to recover the thing sold'upon the writing executed, that writing being an obligation.
What we have said, and the authorities lo which we have referred, show that the distinction between executed and executory contracts or agreements in the common law also exists in tiie civil law, but in a somewhat; modified form, amounting, however, substantially to the same thing. In the former, the absolute dominion will never vest, notwithstanding the executory agreement, until its execution by the giving the legal title, which vests the constructive possession; while in tiie latter, the title is perfected by the making tiie agreement, which vests a right to the thing; and delivery of tiie thing'only is necessary to render the dominion perfect. But this delivery must be natural or symbolical, not actual or constructive; and, without such delivery, a right in the tiling can never be acquired. The result must be, that, tiie property having been sold, the money having been paid, and there having been no delivery, the right is only to the thing; and that right, if refused to be perfected, must be and can be enforced only by action or suit; for wherever there is an obligation, there is a corresponding right to enforce the performance of it. (1 White Keeop., 140.)
4. Was there lesion in the contract under consideration? or, to speak in language which may, perhaps, be better understood, was the sum of money, which was the cause of the sale, so far below the just price as to subject the contract to the rule of the civil law. We have seen what that rule is, and it only remains to inquire whether the contract under consideration comes within that rule.
On this subject a great mass of testimony is found in the record, to all of which we have given our particular attention; and after a careful examination, have not been enabled to come to a conclusion different from that at which the jury arrived in tiie court below. More than twenty unimpeached witnesses testify to facts entirely irreconcilable with the defense set up. Prom their testimony, we can come to no other conclusion than that, in 1830, the time when the contract is proved to have been made, in the neighborhood where the land in coutest is situated, there was no fixed and ascertained price for land. There were no purchasers, no money, and a large amount of land in market, if purchasers could be found. The only semblance of a fixed price anywhere shown, in the testimony is that which speaks of tiie acquisition of land by clearing it out of the office — the expense of which was about one hundred and twenty dollars for each league; in consideration of which, half was obtained, and thereby one half of the league would be obtained, making a league, on this basis, worth about two hundred and forty dollars. Should this sum be taken as the just price, it will then be manifest that there cortld have been no lesion in this contract; for the sum given as the price, in the contract under consideration, was §S58.38, and the just price would be $840. But there is testimony in the record upon which it is insisted, not only that something less than the half of the just price was given, but that the amount was greatly less, amounting to lesion inormisvma.
This proposition is founded upon the testimony of tiie Milligans and others, who testify as to sales, and the price of lands as being one dollar per acre, the price given in this case being only a little more than five cents. Without, in the least, questioning the veracity of the witnesses alluded to, it is manifest to us that, if they are to be regarded as intending to testify to anything conducing to prove that the just price of the land iiCquestion was one dollar, or anything like ttiat sum, per acre in 1830, they were mistaken. But we do not believe they did intend lo be so understood. The greatest length to which their evidence can be extended, in our judgment, is, that most persons who did not wisli to leave the country asked one dollar per acre; for this is accom- *70 pnuiecl with the fact which is added, that, with those intending to leave, only a nominal price was sought, in order to raise the means with which to cross idle Sabine. II the just price had been one dollar per acre, even I,hose leaving- the country could have realized something more than what was considered a mere nominal price, which it is evident amounted to next to nothing., And the fact that, but small prices could be obtained, is clear evidence (hat the one dollar mentioned was not the ascertained just price. But it is evident that the one dollar mentioned was regarded as the intrinsic value, fixed, not by any ascertained rule of computation of value, but only with reference to the great fertility of the soil and the great price which, by means thereof, the, commodity would command in future times. But, in ascertaining this intrinsic price, a necessary element was disregarded, which was the fact' that, at the same time, lands of the like fertility could have been obtained by clearing them out of the office; and this element is the only one which we have been enabled to find in the testimony which affixes the cash value or price. It is true that small tracts of choice laud, in different parts of the country, were sold for sums greatly more than double the price given in this case; but this was in consequence of some particular reason, taking them out of the general rule.
The town of Bravo was on the Brazos, on the side of the river opposite to the locality of the land in question; there was a prosperous settlement which, in 1826 or 1827, was broken up by the Indians, and at the time of the sale in question no one was living there; and whatever factitious value might have been placed on the lands in the neighborhood, that value no longer existed after the settlement'was broken up, and the population in other parts of the country. There could have been, then, no fixed value on the land in question, because no one had use for it, it being in the power of all persons wishing to obtain farms to obtain them elsewhere on good terms, in localities where they would not be subject to Indian depredations, as thejr would have been on this land.
These arc the reasons which operate on our minds, inducing the conclusion that the finding- of the jury in the court below, on the question of lesion, was correct.
The court, in its instruction to the jury, said, that “the value of a witness’s testimony depends upon his means of information and manner of testifying; that the positive testimony of a witness who possesses means of accurate information ought to have more weight than the testimony of a greater number of witnesses who do not possess the same means of information, and do not swear positively; but that where all the witnesses are equally entitled to credit, and possess the same means of information, and in all other respects stand on an equal footing, the jury are authorized to allow the greater number of witnesses to preponderate.”
Though to this charge an exception was taken in the court below, no objection is here made to it, we presume for the reason that it could not be maintained to be in violation of any known rule of evidence, or as in any manner misleading the jury. TVc give our entire assent to the charge. The correct rule by it is given with distinctness and clearness, so that it could not be misunderstood ; and, by its application to the testimony, the jury were enabled to arrive at a correct conclusion, and, under its guidance, found a verdict perfectly satisfactory to us. But were we so unfortunate as to differ with the jury in regard to the proper deductions from the evidence, when considered in connection with the rule given by the court in this instruction, yet wo would not fuel ourselves authorized to set asido the verdict, because the question submitted to the jury was purely and only a question of fact, the ascertainment of which was legitimately and properly within the province of a jury. That fact was to be ascertained by the deliberate weighing and consideration of a great mass of testimony, in some respects in conflict.' Under such circumstances, it lias been frequently held, in this and other courts, that a verdict rendered under such circumstances should not be set aside. (Carter v. Carter, 5 Tex. R.)
*71 5. Before the trial in the court below, the defendants asked the court, by motion, for leave to withdraw all the previous answers, and for leave to file other pleas. The court gave leave to file amended answers, but refused the leave to withdraw, and thereupon new pleas were interposed, which therein are said to be “in lieu of all others heretofore pleaded, and that they rely solely on the same, withdrawing all other pleas heretofore filed in the cause."’ On the trial, only the now pleas were read by the defendants as part of the pleading. The plaiutiff, by counsel, insisted that the old pleas should also be read, and the court permitted them to be read by the plaintiff; and thereupon defendant asked the court to instruct the jury, “that the pleas, answers, and demurrers which had been withdrawn could not he received as evidence to support the plaintiff’s action;” which charge was refused.
In these rulings we have been enabled to detect no error. It is evident that the substance of the motion to withdraw was, either to withdraw the pleadings from the file, or, by obtaining- the opinion of the court, to place them in a positiou in which they could no longer be regarded as part of the pleadings in the cause. This we regard as entirely inadmissible, under any circumstances, without the consent of both parties; for, as soon as filed, both parties to the record may have an interest in them. It was, however, competent for the court to permit the defendant to abandon such of his pleadings as he might think proper, as was accorded to him, because he was not required to read that which he said he had abandoned aud would no longer insist upon as a defense. The pleas, however, remained in the record as a defense which had been inter-' posed by the defendant, and we can see no reason why any admission in these defenses were not as binding on the defendants as those contained in those pleas read by them to tlie jury. To avoid their admissions, we must presume, was the object of the effort to withdraw them; for the instruction is predicated upon their supposed withdrawal being a destruction of the evidence afforded by the admissions in them.
G. The last question, argued by the counsel who concluded for the appellant, is one which, in our judgment, cannot he raised upon the record. The counsel, witli great plausibility and force, has urged upon the court that the whole of the answer filed and sworn to by John P. Coles in his lifetime, having been read to the jury, if any part was to be taken as legitimate evidence, the whole was; and then, that though it did appear'from said answer that the contract of sale in question was made on the 12th day of January, 1830, by the same answer, it appeared that the same was founded upon a consideration which had failed by the non-performance of the agreement upon the part of Austin.
The first conclusive answer to this is. that the question was not made in the court below. Instead of it being true that this question was made below, in any form whatever, it is most manifest that the only and sole effort was to avoid the force of the admissions as to the making a sale, and its date. To attain this end was the object of the motion, the instruction asked, the exceptions taken to the ruling of the court, and the assignment of error in this court. It would he requiring much of us, on questions of tills kind, were we compelled to say that, upon a question not made in the court below, that court, in refusing a new trial, had committed an error in judgment on a question not brought to the consideration of the court, and upon which its judgment was not pronounced. But such is not the requirement of the law, for this and other courts have repeatedly ruled that no questions can be raised in an appellate court which did not legitimately arise out of the record, and which were not made or supposed to be made in the court bglow. (Petty v. Cleveland, 2 Tex. R., 404; Hansborongh v. Towns, 1 Id., 58.)
Again, there was nothing in the form of a defense before the jury under which the facts insisted upon could have been used. The defenses set up by Coles in his lifetime had been abandoned, and were not brought to the consideration of the jury as a defense in any form, as far as we can ascertain from the *72 record, and wére not a part oí the record’for any purpose connected with the defenses to be made. The pleadings abandoned were only read to tlie jury to show the admissions of the defendant. And if the question under consideration had been raised ou the trial in tlie court below, and the facts iiad been proved and found by the jury, there could be no decree upon the finding of them, because there was no pleadings relied upon by defendants upon which the decree could rest as its basis. (Hall & Jones v. Jackson, 8 Tex. R., 305)
But again : the facts which, by the argument of counsel, are insisted upon as a defense, showing a failure of consideration, are not proved. The answer in question was not read as evidence to the jury, hut as a part of the record— part.of the defense — which had been interposed'by the defendant, but not then relied upon. If offered to the jury as part of plaintiff’s testimony, though in a court of equity, such parts only of it as tlie party might wish to rely upon might be read, and such only would be considered in proof. Yet where the whole was read, the whole would be evidence as well for the party reading as for the other. But not having been offered as evidence, but as pleadings oilly, such admissions as were contained in such pleadings were not required to bo' proved, and no evidence of their truth was required. (1 Greenl. on Ev., sec. 27, p. 3.)
Before concluding .this part of the subject, we must be permitted to say that the statement in the answer of the defendant, John P. Coles, as to the consideration for the sale in question, is indistinct in its character, and, to our mind, furnishes no evidence that a wrong or violation of law or of his duty as empresario was intended. The transaction, if true, is capable of an innocent interpretation; and, if necessary, a state óf case might he supposed in which Austin might have performed his agreement and not be subject to the charge of a violation of his duty as empresario. The defense cannot be set up in tins court, for the reasons which have been given.
Were it properly interposed by plea, insisted upon in the court below, and proved, we would have no difficulty in holding the facts a good defense against enforcement of the contract under consideration.
7. It is attempted to he maintained that the court below had no jurisdiction, because the suit was brought as to the title to land, which should have been commenced in the county in which the land was situated; and, it not appearing that the land was in Washington, the same ought to have been dismissed in the court below, and will now be dismissed here.
Several reasons might be given why this position cannot be maintained. We will content ourselves by saying—
1st. That this question was not raised in the court below.
2d. If it liad been, it would have been shown that tlie land, at the time of the commencement of tlie action or snit, was entirely in Washington county, and now is partly in that county; either one of which would have been sufficient (o obviate the difficulty, should it have been thought in the court below that tlie question could be raised after answer to the merits.
8. It is insisted that tlie plaintiff in the court below had no right, either to commence the action, or, after commencement of it, to prosecute the same to judgment; because lie sues in the character of executor of the last will and testament of Stephen F. Austin, deceased, and, by his own showing, at the time of the commencement of the action, had been appointed more than one year; had not shown a continuance of his character by the proper tribunal, and, consequently, was no longer such executor.
We will not stop to examino what would have been the effect of this objec- . tion liad it been taken iu due time and in the proper manner.
At the time of the commencement of this suit in the court below, in 1839, tlie civil law of Spain was in force. In all cases it was the rule of decision, except where in conflict with the Constitution and laws of the Republic, or with the nature of our institutions. Out of its rules for pleading and prae- *73 tice has arisen, to some extent, the system oí pleading by which we are now governed; and by those rules of pleading and practice tiie courts were governed in 1839.
One of the fundamental principles of those rules will he found to have been, and to be, that all exceptions taken to the person of the plaintiff, tending to show that he had no right to maintain the suit in the character in which lie does sue, are dilatory exceptions, which must be interposed before contestation, which is the auswer to tiie merits; and if not so interposed, can nevei after be made, the failure then to interpose it being an acknowledgment of tiie character in which tiie suit is brought. (1 White Recop., 383; and see Aulanier v. The Governor, 1 Tex. R., 667.) The exception was not so interposed, and cannot now be allowed.
Here we conclude our examination, having- disposed of every question which we deemed worthy of consideration. Our conclusion is, that tiie judgment in the court below be, in all things, affirmed.
Judgment affirmed.
Cabuthebs, S. J.
The first and most important qnestion presented for adjudication by the court, in tiie record of this cause, now properly before tiie court for consideration, is the question arising upon the demurrer filed by the defendants below to plaintiff’s petition. The demurrer, putting in issue tiie character and legal effect of tiie writing, which is the foundation of this suit, devolves upon the court the duty of assigning to tiie writing a character, and of declaring its legal effect when characterized. In the performance of this duty the court, construing and interpreting the writing by the terms in which it is couched, is to be guided by the rules ancl principles of the law of Spain and Mexico in force at the time of the execution of tiie writing. The writing reads as follows:
“ This day, settled all accounts with S. F. Austin up to this day, and fell eight hundred and fifty-eight dollars and thirty-eight cents in his debt, which I agree to pay by the half of the grant of land which I received for a mill tract on the Yegua and Brazos. The said tract is to be divided as follows : beginning on tiie bank of the said Yegua creek, where the lower line crosses it; thence following the lower line of said mill tract on the Brazos river; thence up the said river to a point from which a line due southwest to the back line of tiie said tract will include the lower half of the said grant, so as to be equal in quantity to the part of said grant which I retain on the south side of the Yegua and on the Brazos above the before-mentioned southwest line. Also, I agree to let said Austin have the half of the two labors which I got from James Hope at Bravo; and should the land which I sold to said Hope, being six labors, fall within the half set apart for Austin in the agreement, it is understood that the Bravo tract is to balance the land so sold to Hope; that is to say, the half set apart for Austin is to'include the land sold to Hope, and no deduction is to be made from my half on account of the laud sold to Hope.
(Signed) “Jtsro. P. Coles.”
There is no date to this instrument, but, from the pleadings in the cause, the time of its execution is fixed on tiie 12th of January, 1830.
Now, by the law of Spain and Mexico, in force at the time of the execution of this instrument, what character is to be assigned by tiie court to the instrument? — what its legal effect to be declared by the court?
For the appellants it is contended, that, construed and interpreted according to its terms, by the law of Spain and Mexico, it is either a mortgage, (hypotica,) a pledge for the security of the debt, recited in and acknowledged by the instrument, or it is an executed contract of purchase and sale, vesting, absolutely, in Austin, the dominion in the half of tiie land set apart for him in the writing.
By tiie civil law of Spain and Mexico, mortgage is defined to be “a *74 contract by which one binds his property to secure the payment of some other obligation.” (Schmidt’s Civil Law of Spain and Mexico, ISO.) The Civil Code of Louisiana defines mortgage, “a right granted to the creditor over-the property of the debtor, for the security of his debt.” (C. C. of La., p. 403.) A mortgage, (hypotica.) in the civil law, was considered a species of alienation, vesting in the creditor at the time when made, (inpresenil',) a right in the t iiing pledged, which would enable him to sell the pledge in default of payment of the debt. (White’s Recop., 140, and authorities there cited.) Looking’ alone to the language employed in drafting this instrument, to its verbal terms, construing and interpreting those terms by the application to them of the rules and principles of the law of Spain and 'Mexico in force at the time of its execution, is this instrument a contract by which Coles pledges the one half of the land described in the instrument for the security of the debt of 8858.38 rents, which in the writing he admits to be due from him to Austin ? Does the writing simply grant to Austin a right over ” tiie one half of the land it describes for tiie security of tiie debt due him from Coles? Was such the intention of Coles and Austin at tiie time lie, Coles, executed the writing, that intention to be deduced from the terms employed by him in drawing up the writing, the rules of the civil law interpretingthose'terms? After much and mature deliberation, I reply negatively to tiie propositions advanced in those inquiries.
“This day, settled all accounts with S. P. Austin up to this day, and fell eight hundred and fifty-eight dollars and thirty-eight cents in his debt.” There is something more in these words than a mere informally-expressed acknowledgment of indebtedness. These words state an account between Coles and Austin, ascertaining a debt due from Coles to Austin. Previous to tiie writing of this instrument, there were running accounts between the par-lies lo the instrument. Neither may have known certainly that the other was indebted to him, or that he was indebted to the other, or that upon an account stated there would be any indebtedness at all from tiie one to the other, at least they did not know that a debt, eo nomine, a certain sum of money, was due from one to tiie other.
These words ascertain that fact by stating an account between the parties to the writing, and showing the indebtedness of Coles to Austin. If I am right in this, what, then, becomes of the doctrine of a pre-existing debt, so strongly relied on by counsel for the appellants as one of the usual indicia showing a mortgage? In a contract of mortgage, the debt to lie secured is always known and ascertained at the time the contract is reduced to writing. Here tiie writing ascertains and creates the debt. But the words next immediately following, viz, “which I agree to pay by the half of tiie grant of land,” are the words which the counsel for the appellants contend designate the character of this writing, making it a mortgage. They contend that a proper and legal construction of this phrase, “which I agree to pay by the half of the grant of land,” would imply an undertaking upon tiie part of Coles to he done and performed in futuro; that the debt acknowledged in the writing was not then in presentí paid, or intended to be paid, with the half of the graut of land described, but was thereafter in futuro to be so paid.
This, I admit, would be the reasonable interpretation of this phrase, “which I agree lo pay by,” &c., wrested and insulated from the coni ext. But this construction of the phrase would, I think, negative tiie proposition for which they contend, to wit, that this instrument, in its legal effect, is a mortgage, (hypotica,) for, we have seen, in the civil law, mortgage is considered a species of alienation conveying a right in presentí, in the thing pledged to the creditor, for the security of his debt. But if the phrase, “ which I agree to pay by,” &c., is to be construed as implying a promise or undertaking, upon the part of Coles, to be done and performed in futuro, then no right in the one half of the land intended for the security of his debt passed in presentí to Austin by virtue of the writing; consequently the writing could not be a mortgage, (hypotica.) *75 Now, that the “one half of the grant of land” was intended hy the parties, Coles and Austin, to be in some way bound for the payment of Coles’ debt to Austin, is too evident for controversy. Interpreting the instrument for the purpose of seeing how, in what manner, and to wiiat extent this “one Half of tlie grant of land” is to be made “to pay” this debt of Coles to Austin, I would paraphrase the words, “which I agree to pay by the half,” retaining, I think, the sense and meaning intended to he conveyed by them, thus : after tiie words “in His debt,” I would say, which debt Í now pay by tlie half of tlie grant of laud, or, in payment of which debt, I give the half of the grant of laud. Construing this instrument, each part by the whole and the whole by every part, it is evident, I think, that this is the legitimate construction of the phrase in the writing, “which I agree to pay by the half,” &c.
This interpretation of the phrase is, I think, sustained by tlie particular directions contained in tlie instrument as to the manner in which Austin’s moiety of tiie land is to be ascertained; that is, by dividing tlie grant of land into two equal moieties, distinguishing and separating the half Austin was to have from the half retained by Coles, by regular metes and hounds, courses and distances, with all tlie particularity of an actual survey, having a “ beginning” point from which to run. This construction derives additional support from the words used by Coles in drawing the instrument, “ the part of said grant which I (Coles) retain,” clearly implying that lie, by the instrument, parted with, and passed to, and intended to part with, and pass to, Austin in presentí a right to one half of tlie grant of laud mentioned in the instrument.
This interpretation is further corroborated by the exception contained in the conclusion of tlie instrument, providing, “my (Coles’s) half” should bo subject to no deduction should there be any deficiency in tlie half Austin was to have in consequence of tlie six labors Coles bad previously sold to James Hope “falling within the half set apart for Austin in the agreement.” Tlie - words “my half,” “the half set apart for Austin in the agreement,” contained in tiie concluding sentence of tiie instrument, coupled with expression of Coles’s desire carefully to equalize tlie two moieties of tlie laud in quantity by “balancing” (in itself a word of import in favor of the interpretation here contended"for) any deficiency which might be made in Austin’s half from its inclusion of tlie six labors previously sold to Hope by Coles, refer, I think, by certain implication, to a division of the grant of land mentioned in the instrument, made in presentí; by the writing itself, transferring a certain unconditional interest in presentí to Austin to tlie one half of the grant of land, and not to a division of the land to be made in futuro for this purpose. The use of these words in the instrument, “ which Í retain,” “ my half,” “ the half set apart for Austin in tlie agreement,” “ balancing,” in their grammatical collocation and connection with the subject-matter of tlie writing, unmistakably, I think, declares Coles’s intention in drafting tlie writing to have been to transfer to Austin in presentí a certain unconditional right to tiie one half of the grant of land “set apart for Austin in the agreement,” and his understanding and belief that he had done so. Add to this tlie absence of any words of defeasance, or any word or sentence expressing or implying a condition upon which could be raised an equity of redemption, and my construction of tlie instrument is, I think, conclusively established.
The opinion of tlie court in the casi' of Conway’s Ex’r v. Alexander, (7 Cr. K., 218, 241.) relied upon with apparent confidence by counsel for appellants, in the argument of this cause, as authority in support of tiie position that this writing is a mortgage (lujpotica) in its application to this instrument, as far as I have boon enabled to examine tiie case, as reported in the. U. S. S. C. Condensed Reports, is, in my opinion, an authority the other way.
In that opinion it is decided that it is a necessary ingredient- in a mortgage that the mortgagee should have a remedy against tlie person of the *76 debtor. This remedy must arise upon tlie instrument, either expressly or by implication from its terms. A covenant to repay would be an expressed creation of tlie remedy, in the absence of other controlling circumstances. Now, I have shown that upon the construction of tlie writing, the foundation of this suit, construed eacli part by the entirety, and the entirety by eacli part, that there is no covenant to repay Austin the money, in the writing- recited. Then, the remedy is not expressed in the writing. Can it he implied from the terms of the writing'? It could be implied from the acknowledgment in the writing- of a pre-existing- debt. Now, I have shown that this writing, instead of acknowledging- a pre-existing- debt, ascertains and creates the debt. Then,-tlie two circumstances of a covenant (o repay and a pre-existing debt being nowhere in the writing, either expressly or by implication, Austin could have no personal remedy against Coles for the money recited in the writing; and a personal action against Coles being nowhere given in tlie writing in favor of Austin for tlie money, that opinion of the coart decides peremptorily that the writing is not a mortgage.
Interpreting this instrument, then, upon its face, by its own language, and terms, invoking no aid or assistance in its interpretation from testimony extraneous to the writing, parol or otherwise, explanatory of its character, lam decidedly of tlie opinion that the writing is not a mortgage, (Tiypolica.) After mature deliberation upon what is the proper construction and interpretation of this instrument, so decidedly am I of the opinion that this writing is not, and was not intended for a mortgage, QiypoticaJ as to render inapplicable to myself tlie principles so eloquently invoked by counsel for appellants, that if the court should doubt upon this point, the benignant humanity of the civil law would require it to decide tlie point in favor of the obligor in’tlie instrument.
When we look out of the writing itself for evidence of the intention and understanding of the parties, Coles and Austin, at tlie time of its execution, we are presented iu the record with abundant and convincing testimony of that intention and understanding. The receipt executed by Coles to Pei-ry, executor of Austin’s estate, on the 5th of July, 1S38, for seventy-six dollars, the “amount of tax paid by me (Coles) in 1837, on three leagues and a half of land sold by me (Coles) to Austin,” which receipt is incorporated into the petition for the purpose of making- it, I presume, one of tlie material averments of the petition, shows most convincingly, that, at that time, more than seven years after the execution of the instrument, lie, Coles, believed and understood that, by virtue of this writing, lie had conveyed 1o Austin some certain uncon-' ditionai right to tlie three and a half leagues of land specified in tlie receipt. There is in no part of tlie record any controversy raised as to the identity of the land specified in tlie instrument and in this receipt. It is not denied, or attempted to be denied, that it is tlie same land. Tlie presumption of identity, thou, being converted into tlie fact of identity, dispenses with any inquiry in this regard.
Had Coles thought or believed, at that time, that these three and a half leagues of land were, by this writing, merely pledged for tlie security of the debts it recites, he, as a mortgagor, by the civil law, being responsible for the preservation and care of the thing pledged, would have been responsible for the taxes and oilier charges upon the land. (Schmidt’s C. H. S. & SI., 184.) Had lie thought himself tlie owner of the land, and the laud encumbered by a mortgage, or some other special lien created by this writing, at that time when tlie laud had greatly increased in value, as the testimony shows, lie would have discharged the land from this lien, by doing what-his legal representatives, upon the trial of this cause in tlie court below, in-offered to do. lie would have paid Austin’s executor the debt in the writing acknowledged, principal and interest. If, at the time of the execution of this receipt to Austin’s executor, he liad believed or imagined this writing to be simply a mortgage or pledge, instead of requiring Austin’s succession to pay tlie tax upon tlie land in controversy, ho would have asserted liis claim of ownership over the land, *77 when its value hacl greatly increased, and was still prospectively increasing by the changing circumstances of the times. Especially would he have done so; if the contract, at the time it was made, was tainted with lesion, as is now contended, for his legal representatives, it was.
The debt still a subsisting incumbrance upon the land, and the inequality between the value of the .land and the amount of the debt being as great as the plea of lesion and the argument of counsel would intimate. Cole’s requisition upon the succession of Austin to pay the taxes due upon the land, and his singular inertness under the incumbrance of the mortgage lien, taking no steps, not even intimating a wish, to discharge the lien, but illy comport with the character ascribed to him by the witnesses in the cause, who testify as to his character.
Deciding, then, the question of mortgage or no mortgage upon the intrinsic evidence furnished by the writing itself, I am clearly of the opinion that the writing is not a mortgage. Aucl when, in aid of the intrinsic evidence furnished by the terms of the writing, is brought the extrinsic evidence to be found in the record of the cause, out of the writing, the question in my mind admits not of disputation. The conversations between Coles and Austin, as testified to by witnesses in the cause,' who heard the conversations in relation to this particular land, in which conversations the land is spoken of by both of them as being- sold to Austin, are conclusive of the question.
If not a mortgage, what, then, is it? By what name shall it he called? What declare its legal effect? These interrogatories suggested to me difficulties in adjudicating upon the character and legal effect of this instrument, greater than any occurring in the solution of the question of mortgage or no mortgage. A common-law lawyer, interpreting this instrument by the rules and principles of the common law, after pronouncing it no mortgage, world be greatly at a loss to accommodate it with a name, and still more at a loss tt pronounce upon its legal effect when named. He could not call it an executed contract of sale, or a deed of bargain aud sale. Wanting words of perpetuity and a declaration under seal of a use which would draw to it the possession, it would be neither. Nor eonld tire appellative of an executory contract of purchase and sale be assigned to the instrument; for, as we have seen, by virtue of the writing, there was vested in Austin a present unconditipnal right to the land it set apart for him. A civilian, skilled in the nomenclature of the civil law, would, perhaps, find less difficulty in classifying and denominating it, pronouncing with certainty upon its iegal effect. In the character of a civilian, then, the character in which, thus far, I have been investigating the character and legal effect of this writing, I will proceed to ascertain and determine what name would most appositely characterize it, and what its legal effect when characterized.
It is insisted for appellants that, should this writing be declared by the court no mortgage, then it can be none other than an executed contract of purchase and sale, conveying- to Austin full dominion in the one half of the grant of land set apart for him in the instrument; and such being its character and legal effect, the appellees can have no right of action cog-hizable before this court, inasmuch as by the writing itself they are already the lords of the half of the grant of land in controversy, with full dominion in the said half, and consequently they must go out of court taking nothing. Is this position maintained by tlie principles and doctrines of the civil law, as enunciated by eivilists ? In White’s Recopilación, pages 341-345, we have these doctrines promnlged, on the mode of acquiring dominion in property, from Alvarez’s Institutes :
“As dominion is the first species of right in a thing, before considering the mode of acquiring it, it is necessary to explain what is right in and to the tiling. The former is a power {facultad) that belongs to a man in a certain and determinate thing, without reference to any person. (Arg. of Law, 13 tit. *78 11, part 3.) The latter, on the contrary, is the power that a person has against another to oblige him to give or make for him anything. (Arg. of L., 33, tit. 5, part 5.1 The difference between the two rights is clear—
“ 1st. When I have a right in the thing, it is the thing that is bound to me; and when I have a right to the thing, the person.
“2d. By the rigiit in the thing, I ask for that which is already mine; and by the right to the thing, I ask that there be given or made for me the thing that another person is obliged to give to or make for me.
“3d. Prom the right in "the thing, arise real actions against any possessor; and from the right to the thing, only personal actions against the determinate person with whom I contracted. Of the rigiit to the thing, there is but one species, and that is obligation.”
“Tlie distinction is worthy of remark, that is found between the title and the mode of acquiring dominion, and it must be borne in mind in regard to everything that will be hereafter treated of. All dominion lias two causes, proximate and remote; proximate, is that by which, without the mediation ot any other thing, the dominion is obtained; and remote, is that which must precede, and by means of which it is acquired. Por example: If 1 buy a jewel from Titius, and he delivers it to me, I acquire dominion. In this case the delivery is the proximate cause, and the contract of purchase is the remote. Proximate cause is called mode of acquiring, and the remote, title. By the title, a right is only acquired to the thing, and by the mode of acquiring in the thing. The title gives only a personal" action against the person with whom we contract; and the mode of acquiring gives a real action against any possessor.”
“Por a general rule, title never gives a right in the thing unless delivery be joined with it. Of the modes of acquiring, some are called originary and some derivative. If we. acquire a thing that is not in the dominion of another, as a wild animal, it will bo an originary mode of acquiring; but if a thing that is in the dominion of another be transferred to us, and delivered by its owner, it will be derivative. Delivery is the only derivative mode of acquiring. It is a derivative mode of acquiring by which, the lord of a thing, who has the right and intention of alienating it, transfers, with just cause, a corporal thing to him who receives it.”
-“Delivery is either natural or symbolical; the thing must be delivered by the lord. Dominion is not transferred if there be not an intention to alienate.”
“Dominion is not acquired by delivery unless preceded by a title suitable to transfer it — as, gift, sale.”
Tested by the principles and doctrines here advanced, is the position contended for by counsel for appellants, that this writing, if not a mortgage, is an executed contract of purchase and sale, transferring to Austin full dominion in the half of the land in dispute, maintained?
We learn from these doctrines, as here enumerated, that in the civil law there are two species or kinds of right to property — a dominion in the property the subject of contract, and a right to the property. An individual possessing dominion in the property would he the absolute lord of the property, holding it by as complete and perfect a title as at common law before the statute of uses was created, by enfeoffment with the ceremony of livery of seizin, actual or constructive.
And as no judicial proceedings would bo necessary or could be had at common law for the purpose of perfecting or giving additional and more unquestionable validity to a fee acquired by enfeoffment, with the ceremony of livery of seizen, actual or constructive, so, in the civil law, no judicial proceedings would he necessary or could be instituted to perfect a right in property arising from dominion in the property.
Was this dominion in the land in dispute vested in Austin? If so, then the judgment of the court must be a judgment of dismissal.
*79 By the civil law, as we have seen, there are two causes, as it is phrased in that law, of dominion over property: the one called the proximate cause, the other the remote cause; proximate cause denominated mode of acquiring; the remote cause denominated title.
The mode of acquiring is the cause of dominion in property. Of this there are two kinds — originary and derivative.
By the originary mode of acquiring, dominion in property is acquired over property not in the dominion of another, or common property.
By the derivative mode of acquiring, dominion in property is acquired by the transfer of it from one person to another.
By which of those two modes of acquiring, the originary or derivative, is Austin’s right to the land in dispute acquired? By the derivative, most certainly, as the right is transferred by the virtue of this'writing, executed by Coles to Austin.
Now, there is only one derivative mode of acquiring, and that is delivery.
Delivery, in the civil law, is either natural or symbolical, answering to the common-law division of seizin, into actual and constructive. Was there, at the time of the transfer of the land in question to Austin by Coles, in this writing, any delivery of the land to Austin?
This is nowhere shown, from the testimony or otherwise, in the record ; nor has it been presented in argument that either the one or the other mode of delivery had been made, but the reverse is strongly insisted upon.
Then, Austin acquiring a right to the land in dispute by the derivative mode of acquiring; and there being hut one kind of derivative mode of acquiring, that is, delivery, and there being but two kinds of delivery, natural and symbolical, neither of which was made at the time of the transfer of this land by Coles to Austin, — it follows that the right transferred to Austin to the land in question, by the writing, was not full dominion in the land. Austin, then, not acquiring by virtue of the writing dominion or right in the land, what, then, is the character of the right acquired under the writing?
By my construction of the writing, we have seen that lie acquired some certain unconditional right to the land. What call we that right? It can only he called, in the civil law, a right to the land in question — a titular right, vest ing in Austin such a right to the land as. at common law before the statute of uses, would have been acquired by enfeoffment without livery of seizin.
It is. in the civil law, a titular right to the land, acquired from the remote cause of dominion, that is, title.
Now, in the civil law, by title, as a cause of acquiring dominion over property, a right to the property is only acquired, and not a right in the property.
The law says, as a general rule, title never gives a right in the tiling, unless delivery he joined with it.
We liave seen there was no delivery of the land in question by Coles to Austin, either natural or symbolical. Now, there is nothing in the writing itself, or in the testimony before the court, which would constitute this contract an exception lo the general rule, as stated. The testimony in the cause warrants the reverse opinion.
Having now seen that Austin’s right to the land is necessarily to bo referred to the title, the remote cause of dominion over property; that title never gives dominion in the property, unless delivery bo joined with it; that there ivas no delivery, natural or symbolical, of the land in dispute, made by Coles to Austin, — it follows, ex necessitate, that the right to the land conveyed by this contract to Austin is not a right in the land, but a right to the land acquired by the remote cause of dominion, title.
Now, to the person holding a right to the property, the civil law gives a personal action against the lord of the dominion in the property, to compel him to cede to the possessor of the right of the property the full dominion in the property.
Then, Austin, in his lifetime, holding under this contract the right to (lie land set apart for him in the writing, would have, had a personal action against *80 Coles to compel him to cede to him, Austin, dominion in or the right in the land set apart for Austin in the contract, which could only be done'by the decree of some court, compelling Coies to execute to Austin the usual mu-niments of title then customary. Tims, I think, the civil law supplies a name for this writing, and pronounces authoritatively upon its legal effect.
It is in that law, an executed contract of purchase and sale, vesting in Austin a right to the land set apart for him in the instrument, with the right of a personal action against Coles, to compel him, Coles, to cede to liiuñ Austin, the full dominion in the land. It is in the civil law, an executed contract of pin-chase and sale, vesting in Austin a titular right, giving him, as the word implies, a right to tlie land without the possession,"but with a right to the possession.
Austin and Coles both being dead, this right of action survived to Austin’s heirs, against the heirs of Coles, which was the action instituted in the court below. The actiou, therefore, was properly brought in the court below, anil is legitimately the subject of judicial cognizance before this court, upon appeal from the judgment and decree rendered in the court below.
And here — an opportune time occurring for it — I would make a remark upon the testimony in its connection with the question of mortgage or no mortgage.
After the examination we have had of the rules and principles of law by which this writing is explained and governed, the testimony furnishes additional reasons, if any were wanting, in support of the interpretation I have given to the instrument construed by its terms. Coles, a shrewd, intelligent, and sagacious man, actively engaged in the accumulation of landed estate, if credence is to be given to the assertion made by appellants’ counsel in the argument of this cause, and the assertion is sustained by the character of iiis business transactions, and the character given him by the witnesses, — was conversant with and perfectly understood the principles of the law, in force at the time this contract was made, governing contracts of purchase and sale of lands.
Being so familiar with those principles, the presumption is a fair one, that he, by tiiis coutract, intended to convey to Austin the very right to the land in question which, by the law as we have seen, he did convey to him — a presumption. made a violent one by the recent he executed to Austin’s executor for the money clue as tax upon the laud.
This receipt is satisfactorily explained only by the supposition that, knowing he was the lord of the dominion in the land, he was responsible to the Government for the taxes upon the land; but, believing that he had by this writing conveyed to Austin the right to the land, he thought it but just that Austin’s succession should pay the taxes on the land.
Having thus disposed of the first and most important question presented in the record for adjudication, I will now enter upon an investigation of the next most important question in the cause.
This quest ion arises upon the plea of lesion, or such an inequality between the price paid and the value, of the, land bought, in this contract at the time of its execution, as would, in the civil law and in equity, avoid the contract.
An extended commentary upon the law of lesion, as it obtained in the civil law, is uncalled for here.
Suffice it to say, that lesion, affecting this contract to the extent charged in the third plea filed by the defendants in this cause — that the price paid by Austin to Coles for- the land in question was not more than half the value of the land — though plead in connection with the plea of tender of tire purchase-money and interest, would trot, under tire law in force at the time of the execution of the contract, authorize a rescission of the contract, as prayed for in that plea. (Schmidt’s C. L. S. M. 106; Novis. Rec., 1. 3, tit. 1, b. 10; Partidas, 1. 02, tit. 6, p. 5.)
5Tor, in tiro consideration of this question, do I conceive it necessary to investigate tire point made by counsel for appellee, that admitting tire *81 lesion charged in the fourth plea of defendants, viz, that the price paid by Austin to Coles was less than one half the value of the land at the time of the sale, yet in the civil law it could only avail the party injured in a rescissory action, and not as a defense to a bill in equity, filed to enforce the specific performance of the contract.
This may or not be so. The la>v certainly favors the position, if it does not absolutely maintain it.
If lesion, amounting to less than one half the value of the land sold by this contract, affects the contract as charged in defendant’s fourth plea, it would show such gross unfairness in the transaction, such an inadequacy of the price paid to the value of the laud, as would so taint the contract witli fraud as imperiously to require any court of chancery, sitting either under the civil or the common law, to vacate the contract, upon the ground of fraud.
That mere inadequacy of price would not be ground for annulling the contract, if the same be fairly entered into and understood by the parties, is a principle fully recognized in the j urisprudence of the civil law. (Fonbl. Equity, page 21, note and authorities there cited.)
Although I am well aware that the civil-law doctrine of contracts is imbued with a greater and more chaste infusion into them of the principles of ethical justice than is the doctrine of contracts in the common-law system of equity jurisprudence, it is to be regretted that these principles of ethical justice, obtaining and governing contracts in the civil law, do not more extensively pervade the equity jurisprudence of the common law.
The question, then, of lesion, or fraud — for, as charged, to affect this contract, the terms are synonymous — is fairly and legitimately before the court for its adjudication. It is a question of fact, determinable exclusively by the testimony in the cause. This testimony being much more voluminous than variant, a consideration of it in the numerical''order of its introduction upon the record, if not absolutely precluded, would certainly be a work of suporerrogation.
All that could be expected from one deciding this cause now would be, a rapid and closely-condensed synopsis of the testimony. To this duty I will now address myself.
Some one of the more than twenty witnesses introduced by tire plaintiff, upon tire trial of this cause in the court below, establish by statements — credible, because unimpoacbed — these several material points: that the land in controversy was situate at the junction of the Tegua and Brazos streams, in the now counties of Washington and Burleson, then Austin’s colony; that Coles came to the oountiy with but little means; that upon his arrival, he formed an intimate acquaintance and friendship with Austin; that lie ivas employed by Austin as his agent, to collect for him land dues from colonises in the upper part of Austin’s colony; that in the performance of this duty, by appropriating to liis own use the "land fees collected in his agency, he contracted a debt witli Austin ; that at the time this contract was made, an ascertained debt was considered, in the custom of the country, equivalent to so much cash; that at this time Austin was preparing for his departure for the interior, to settle his accounts as empresario with the Government of Mexico; that lie was pressed for money; that at no time was he in possession of much money; that lie was responsible to the Mexican Government for the land dues collected by Coles, as his agent, from the colonists; that Coles brought little to the country, and was indebted for his start in the country, principally, to the land dues lie collected for Empresario Austin; that at the time this contract was made, land had no fixed value ; that lands to any amount, in the region of country where the land in question was situated, could be had for clearing them out of the land office, one half for the other: that the fees for clearing them out of the office would amount to, from §110 to §140 the half league; that at this time lands were plenty, settlers few, and money scarce; that but few sales of land were made for money in 1830; that the part of the land *82 retained by Coles was much the most valuable, being- higher and less exposed to inundation; that some sales were made, the purchase-money paid in property; that land could begot in 1830 for something-like $100 the half league, paid in money; that Austin was a kind, benevolent, humane man in his treatment of his colonists, treating them with the kindness of a father, almost; that Coles was a shrewd, intelligent, sagacious man, his principal business, land trading; that some of the witnesses liad been in the country from the year 1822;'they were acquainted with the land in dispute, and thought, the price paid by Austin a fair one; that property was not considered an equivalent for money; that Coles and Austin, in conversation, spoke of the land in dispute as being sold to Austin; that lands in larger quantities than a league could rarely he sold at any price; that from one hundred to one hundred'ami fifty dollars per the half league, in money, would have been considered a good sale-, particularity in the upper Brazos country; that in 1830 laud liad no value for cash — in no part could it'be sold for a bit an acre; that in 1830, laud above Tegua was but little in demand, being- on the frontier, and exposed to Indian depredations; that in 1830, and for four or five years after, land could not he sold for money; that in 1S30, in Texas, times were more gloomy and land less estimated than in 1824, 1825, and 1826.
To this array of testimony the defendants oppose the testimony of some four or five witnesses. John Milliean testifies that, in 1828 or 1820, he purchased 1002 acres on the Oyster Bayou, and bought from the Cutis’s a half league in the neighborhood of Coles, for which he paid twelve and a half cents for a part and twenty-five cents for a part; does not think eight hundred and fifty-eight dollars would have been a fair valuation for three and a half leagues on the Brazos bottom, above the month of the Yegua; thinks the land sold was worth one dollar per acre at the time of. the sale ; there were several sales in the neighborhood, hut floes not know file prices; Austin asked two dollars per acre for some land on Brazos river; recollects of no sale in 1830. lie considered the land in controversy very valuable — worth, intrinsically, if every thing turned out well, at least otic dollar per aere; but there was much land, and no buyers, of consequence. He 1 lad bought small tracts adjoining the land in dispute, at from one to three hits, in trade.
E. Milliean testifies that the river land was worth one dollar per aere ; this was the lowest estimate placed upon river land by those who intended remaining in the country; that Judge Coles’s land, sold to Austin, at the time of the sale was worth one dollar per acre; that some land was sold by Coles to Hope, previous to 1830, for one dollar per aero; that land in the neighborhood of l.he land iu question was worth from twelve and a half cents to one dollar per aero, but luiew of no sales at that price; that persons leaving- the country would sell lands for a mere nominal price; that he heard Coles say that the land sold to Austin was valuable; he himself offered seventy-five cents for a part of a head-right claim, but was asked a dollar per acre; that he knew of no sales of land as much as a league; knew of no Brazos bottom lands that could have been bought for less than a dollar; that Coles brought several likely negroes to the country; that ho built a mill, with a thousand dollars ; that Coles was a keen, shrewd man; that the lands of Coles in the Brazos bottom, in 1830, were worth $4,440 per league; that one sale was made at one dollar per acre, but bought back again at the same price, the purchaser paying for the improvements.
Witness Marsh states that previous to 1830 he sold one hundred and fifty acres of land in Brazoria county, lying on the river, for one dollar per acre; does not know what land was worth in the section of country where the land in dispute lay; knew of no sales in the neighborhood of Coles’s land ; knows nothing respecting the titles to land ; knew of no sales of a league, but knew of a quarter of a league on Oyster creek, Brazoria county, selling for a dollar per acre.
Prosper Hope states that he was .acquainted partially with the land *83 sold, and considered it excellent land'; his father bought six labors of Coles’s mill tract for seven hundred and twelve dollars, paid partly in money, partly in goods; that there were but few settlers between the town of Bravo and Millican’s place of residence on the river, except in the town of Bravo, and they, in 1S26, evacuated the town; that the common price of land while he lived in the country was worth one dollar per acre ; that sales of land were frequently made, partly for cash, and partly for property — horses, hogs and cattle &c., which were nearly equal to money at that time.
This comprises, substantially, the material facts testified to by the defendants’ witnesses. The preponderance of numbers is certainly in favor of ap-pellees. Is there a lilce preponderance of weight of testimony in their favor?
It is contended for appellants, that the testimony of the defendants’ witnesses in the court below, being positive testimony, should and must outweigh the testimony of the witnesses for the plaintiff below, that being circumstantial in its character. I admit that if the valuation of the land in dispute, at the time of the sale to Austin, made by the witnesses for the defendants below, be correct, then the contract is, in the civil law, so tainted with lesion as would require of the court, in a rescissory action instituted by appellants, to set aside the contract. And in equity, it would show such enormous fraud as would extort from any chancellor, sitting under the common law, a judgment or decree rescinding the contract, upon the payment of the purchase-money with interest. Intrinsically, is the testimony of the witnesses for the defendants below entitled to full credence? The enormous lesion or fraud it would establish, affecting this contract, is of itself a circumstance which, under all the attendant circumstances snrroundingthis transaction, as appears from the whole testimony in the cause, would withhold for it, from me, full and entire credence.
It is in proof that the contracting parties, Coles and Austin, were, both oí them, men of intelligence, sagacity, and great business capacity.
It is in proof tiiat they were on terms of the most friendly intimacy. It is in proof that Coles, on"liis arrival in the country, became in a manner the protege of Austin. It is in proof that he was the recipient of many favors from him, extended even so far as greatly to incommode Austin himself.
It is in proof that Coles was a man eager in the pursuit of property, particularly landed property; and that but few men, if any, surpassed him in the necessary skill, ability, and energy to succeed in the accumulation of this species of property; that his business was trading in land, and consequently must have known tire worth of this kind of property as well as any man then or now in the country. It is in proof that more than seven years after this transaction, when this very land now in dispute was greatly enhanced in value, and when Austin was with his God. lie (Coles) acknowledged, in writing, to Austin's executor, that he had sold this land years before to Austin, sold by this very contract which his heirs and representatives would now take with such stupendous fraud. It is in proof that Austin was one of the most kind and benevolent of men; that he was justly entitled to the honored appellation of the Fattier of his Colonists; that his memory, now that he is dead, is cherished with the most affectionate veneration by ail of those who knew him in life; nay, more : that the pen which shall chronicle the eventful history of Texas, from its colonization as a province of Mexico up to the time slie assumed a station among the nations of the earth, will portray for Stephen F. Austin a life and character which will attract the admiration and challenge the respect and esteem of the world. Could two such men have made a contract tainted with the enormous fraud with which counsel for the appellants would taint this contract? — a contract seriously affecting Coles in what ho much regarded : his pecuniary interests; — a contract ruinously affecting Austin in wliat lie most regarded : his character and fail-fame? The very statement of the proposition, as much as would the actual commission of such fraud, shocks the understanding. Keason, common sense, alike reject the proposition as preposter *84 ous; presupposin'];, as it does, a sudden and mysterious deprivation on the part of Coles of all that skill, sagacity, and astuteness in speculation and trade which, up to this time, so peculiarly characterized him; and on the part of Austin, as sudden and as mysterious a change from the honest, humane father of his colonists, which, up to this time, he had been thought and was, to the grasping, avaricious oppressor of his people and friends.
I impute not mendacity to the witnesses testifying for the appellants. Disbelief of their testimony does not necessarily imply falsehood in their statements.
Their testimony, though truthful]}’' given, was evidently the dictate of minds more susceptible to present impressions than recollective of past; minds in which, at the time of deposing, memory, as to tire past, was inactive; the understanding, as to the present, alert; minds in which the seen and felt realities of the present overshadowed and put to sleep evanescent remembrances of the realities of the past.
But it is contended that the testimony of the witnesses for the defense, in the court below, being positive, must, in law and equity, outweigh the testimony of plaintiff’s witnesses, that being circumstantial.
I must confess I cannot very well see the application of this rule of law, if any such rule exists, to the testimony in this cause. The statement of the witnesses on the one side of the controversy is as much positive, or as much circumstantial, as is the statement of the witnesses on the other side, so far as I can discriminate between them.
The statement of the rvitnesses on boll) sides is pretty much but the statement of opinions as to what is or is not fact, and not the fact itself, in regard to the actual value of (he land in dispute at the time the contract was made. ’Tis true, the witnesses for appellants state tlieir opinions positively.
The witnesses for the appellee state theirs, perhaps, more inferential]}1, and with less positiveness of assertion. Yet the degree of credence to be given to their respective opinions must be estimated by the number and pertin-ency to tlie point in issue of the facts upon which those opinions are founded, and not by the positive or the inferential manner of their assertion.
Estimating, then, according to this rule, the opinions of the witnesses by the-number and pertinency to the point in issue of the facts or circumstances respectively deposed to’by them, on the one side or the other, as the foundation for their opinions, I thinlc that there can he but one conclusion upon which side the preponderance of credence should fall. In pertinency to the point of the value of the land in dispute, as well as in number, the facts and circumstances upon which the opinions of the witnesses for the appellee is based have preponderance over the facts and circumstances upon which the opinions of appellants’ witnesses are predicated.
Bnt I do not yield unqualified assent to the proposition, as a rule of law, that circumstantial evidence is never to he weighed against positive testimony. There may be cases, and there are cases every day occurring, w’here the testimony of a witness testifying positively to aii asserted fact as transpiring within his view’, and honestly testifying, too, is disproved and falsified by proof of facts and circumstances.known to exist, and the existence of which is wholly incompatible with the fact deposed to. In such cases, circumstantial evidence outweighs positive testimony. ■ And I think the present one of those cases. The saying often qoted, but with most perverse application, both in ordinary conversation and in argument at the bar, “that circumstances never lie, hut that a witness may,” is, when stated with legal precision, a truth. A circumstance necessarily occurring in the natural world in the ordinary course of nature, or a circumstance, the natural and necessary -sequcuce of a preceding circumstance, or a series of circumstances, know’ll to exist, is a fact. From the circumstances, the existence of which is established by the testimony of all the witnesses in the cause, the fact that the consideration passing from Austin *85 to Coles for this land at the time this contract was made was a fair consideration for tlie land, is. I think, plainly dedueible.
I am constrained, then, to the conclusion that under the civil law this contract is not vicious for lesion, and cannot be vacated; nor is it, in equity, tainted with fraud, and therefore cannot bo set aside upon that ground.
The two controlling questions in tlie case being- now disposed of, a rapid review will be taken of the questions presented b3r the assignment of errors.
The first error assigned is the refusal of tlie court, below to allow the defendants to withdraw their pleadings previously pleaded, and upon which they no longer relied. The consideration of this cause assigned for error will involve tlie consideration of several other causes assigned for error in tlie proceedings of tiie court below.
The real question presented by this assignment of error is, Are the records of a court of justice tlie property of the country for a perpetual memorial lo all men of tlie judicial action had upon them? Or, are they the property of private individuals? Tlie statement of tlie proposition is its own answer. They are tiie property of the country. A party defendant may unquestionably abandon any ground of defense he may have set forth in his plea, and, by leave of tlie court, rest his defense upon some other ground lie may think more available. But the plea itself, which states tlie ground of defense relied upon at the time when tiled, is a part of tlie records of the country, in perpetual memorial of what judicial action was had upon it.
A plaintiff may, if he chooses, before answer filed, dismiss liis action; but the dismissal does not vest in him the property in his petition to remove it from tlie records of tiie court and to destroy it. It must remain a record in tlie archives of tlie court, if for nothing- else,' for evidence of tlie fact of the institution of tiie suit, and as a part of tiie proof necessary in rendering a judgment for tlie office costs already accrued in the suit. But suppose, as" was the case in this cause, there were admissions made in tlie pleadings plead by the defendant important to the plaintiff in support of his cause of action, set forth in his petition, — could tlie defendant withdraw his pleas from the record, destroy them, and put tlie plaintiff upon proof aliunde of the facts which, by liis pleas, lie iiad judicially admitted, even most solemnly admitted, under oatli, as was an admission made in this case? Would he be permitted to withdraw from tlie records tlie evidence of this admission, furnished in his pleas? Most certainly not.
If an admission, made orally in conversation, or in writing coram, non judiee, by a party in a cause be competent for testimony for the adverse party, how much stronger tlie reason why tlie party should be entitled to tlie benefit of a solemn judicial admission, made under oatli by tlie party defendant in bis pleas.
Another cause assigued for error is, that the court below permitted the plaintiff to read a copy of Austin’s will, with tlie probate thereon, as evidence in the cause. This cause for error, I presume, is predicated upon the assumption that tlie will, being improperly admitted to probate by the Probate Court, was legitimately before tlie District Court for its adjudication upon the issue of devisavit vel non. This could not be; it was res adjudicata, and could not be inquired into collaterally in this cause. The only way it could have been before the District Court for consideration would have been upon an appeal from a decree of the Probate Court, rendered in that court upon the issue of devisavit vel non.
I find no cause of error in the instructions given and refused by tlie court, as assigned in tlie fifth assignment of error. Tlie court could not have done otherwise than have refused tlie third and fifth instructions asked for by the counsel for the defense. Tlie court having upon the defendant’s demurrer decided this writing upon its face to be a contract of purchase and sale, the jury were concluded by this judgment of tlie court from any further inquiry into the legal character and effect of tlie instrument.
*86 The 12th instruction asked for by counsel for defendants below — that to enable the plaintiff to maintain his suit, it was indispensable, for him lo show that James P. Perry was then the executor of Stephen P. Austin — could not have been given under tiie ruling' of this court in the case of Aulanier v. The Governor. (1 Tex. R., 653.) In that case the court say: “ It is, however, a well settled-rule, that when a good cause of action is shown, and exception only to the person of the plaintiff (is taken,) it could only be sustained by a plea showing who is tiie person really entitled to be plaintiff.” This could only be done by plea in abatement, under oath. (Hart. Dig., p. 245.) This plea was not filed in this cause.
The instruction first asked by counsel for plaintiff in the court below — to wit, “ that where there is a conflict of testimony, a greater number of witnesses must prevail when they stand otherwise equal” — perhaps, propounds the rule of law in terms too broadly stated, and wanting requisite legal precision; yet, given with the qualification of the judge accompanying it, it is the law.
The 11th instruction asked for by defendant below, and refused by the court— “that if it appears from the testimony that the instrument sued on was executed ten years next before the institution of this suit, then tiie right of action of the plaintiff is barred” — could not, whether given or refused, have by possibility affected the result.
The pleadings in the cause furnished conclusive testimony that the writing was not executed ten years before the institution of this suit. Tiie ruling of the court below, then, in giving and refusing the instructions asked for by the parties, respectively, was in accordance with law, and show no ground for a reversal of the judgment and decree rendered in tills cause in the'court below. The usual accuracy, precision, and legal acumen of tiie able judge who presided in the court below is exhibited in the judicial action had upon the instructions asked for, as given and refused by the court.
Tiie question of jurisdiction raised in argument by counsel for appellants could only be before this court for adjudication upon a plea in abatement, filed by the defendants in the court below, or as appearing upon the face of the record. No plea in abatement for want of jurisdiction was filed in tiie court below. The record of the cause, in the testimony of Christman, shows, affirmatively, that a portion of the land in question, some 1,600 or more acres, lie south of the Yegua. By the act. approved December 4th; 1837, defining the boundaries of the county of Washington, the northern lino north of the Yegua, to a ridge dividing the waters of Cummins’s creek from the waters of the Yegua, was below tiie northern boundary of Washington county at the time of the institution of this suit.
Our statute provides that “ where the recovery of land is the object of a suit, the suit must be instituted where the land or a part thereof is situated.” (I-Iart. Dig., art. 6G7.)
Concluding now my review of all the questions presented by the record for. adjudication by this court, and all raised in argument by counsel, I give it as my opinion, (concurring in the opinion of the court as delivered by my brother Judge Hughes,) that the judgment and decree as rendered in this cause by the court below should be affirmed in the manner and form as rendered and recorded in that court.
Judgment affirmed.