Antonio ZEPEDA, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–81–0533–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

June 17, 1982.

Frank Follis, Houston, for appellant.

Larry P. Urquhart, Houston, John B. Holmes, Jr., Dist. Atty., Patricia Saum, Charles A. Rosenthal, Asst. Dist. Attys., for appellee.

Before DOYLE, DUGGAN and DYESS, JJ.

DYESS, Justice.

The appellant was indicted for burglary of a building and theft. Thereafter, he waived his right to a jury trial and moved

to suppress evidence. Such motion being overruled, the appellant then entered a plea of not guilty, signed a stipulation of evidence and waived his right to the appearance, confrontation, and cross-examination of witnesses. The State, choosing to proceed against the appellant on the burglary of a building offense, abandoned the theft charge. Finding the appellant guilty, the court assessed punishment at five years confinement in the Texas Department of Corrections.

The appellant is before this court on a single ground of error, as follows:

The trial court erred in overruling Appellant's Motion to Suppress Evidence because the warrantless search of the residence where Appellant was arrested was not supported by probable cause or exigent circumstances which would justify the search.

Before discussing the appellant's single ground of error we give a brief statement of the facts as follows.

At approximately 2:00 a.m. on the day of the appellant's arrest, two officers of the police department, Inman and Meaney, were flagged down by Mr. Cruz. He told the officers that he had seen two Latin males walking down the street pushing a shopping cart full of stereo equipment. Further, Mr. Cruz pointed out a house owned by Mrs. Flores, because he had seen the two men run to the back of such house. Cruz did not say that he saw the men steal the goods, and, at this point, he was not asked any background information to determine the reliability of his information.

The officers found the shopping cart in the Flores' front yard. When additional officers arrived, they were sent to the back of the house to guard against a rear door escape while Officers Inman and Meaney knocked on the front door of the house. The knock was answered promptly by Mrs. Flores who was waiting up for her son and daughter to return from a dance.

A conflict in the respective accounts appears at this juncture. Mrs. Flores testified that the officers came into the house, without saying so much as a word to her, and

began to search the house until they found the appellant and his co-defendant, Castro. The officer Inman testified directly to the contrary. Each one testified to the voluntary consent given by Mrs. Flores.

After entry was gained and the search was conducted, several electric guitars and an electric organ were found in the room where the appellant and his co-defendant Castro were either sleeping or pretending to sleep. Thereupon, the appellant and Castro were questioned independently about these items of property, and Castro confessed that he and the appellant had taken the property from a church in the neighborhood. At this point, the officers arrested the appellant and Castro.

There is no claim by the State that the officers had probable cause to search the house. In fact, the entire absence of probable cause is clearly the reason why the State chose to rely on the consent given by Mrs. Flores as the basis for admittance of the spoils into evidence. The controlling questions on this appeal are whether Mrs. Flores actually gave consent, and, if so, whether it was voluntarily given.

■ A consent search, from the State's point of view, is one of the most desired types of searches because it allows officers to search premises where probable cause is lacking. When consent is given, evidence may thereby be uncovered in a situation where there was no other lawful basis for making the search. That is the case here. LaFavre, 2 Search And Seizure, § 8.1 (1980).

Concerning the matter of whether or not Mrs. Flores gave her consent to the entry and search by the officers we quote her testimony briefly as follows:

Q. What happened to let you know that somebody was at the door?

A. Well, I just wait on my daughter and son to come from the dance and I heard the door. I just open the door and the police come in.

Q. You thought it was your son and daughter coming home?

A. Yeah.

Q. Did the policeman say anything to you?

A. No, he just went straight to the kitchen and he go in the other room and I wasn't—well, when I heard the door, I don't look outside, I just open the door. When the police go straight to the kitchen and go through the other rooms and I said, "What you looking for," and he don't answer me nothing, he just go in all of the rooms.

Q. Did they ask you if they could have your permission to search the house?

A. What?

Q. Did the police ask you?

A. No, they didn't ask me nothing.

Q. They didn't say anything to you when they went into the house?

A. No.

Q. Did they ask you for permission to search that room where Antonio and Raymond were?

A. No.

Q. You speak English pretty good?

A. (Witness nods head affirmatively)

Q. But you have a little trouble with English?

A. Sometimes. Sometimes I don't understand. I try to understand.

Q. Did any of the officers that came in ask you in Spanish for any kind of permission or consent to search that house?

A. No.

Q. Did you know what they were looking for?

A. No.

Q. Did they tell you they had a search warrant?

A. No.

Q. Any kind of paper to search the house?

A. No.

Q. Did they tell you they were there to arrest someone or that they had an arrest warrant for someone?

A. No, they don't tell me nothing. He just go, you, know, check the rooms and then he go and pick at him and Raymond. He take them to the car.

Q. So from the time he came in until he got Raymond and Antonio and took them to the car, he never said anything to you?

A. No.

Q. Did any of the officers ask you anything?

A. Just two.

MR. FOLLIS: That's all I have.

Officer Inman testified on this same matter as follows:

Q. And did you have—did you yourself have an occasion to meet Mrs. Flores that evening?

A. Yes, sir, I did.

Q. Would you describe for the court what your encounter with Mrs. Flores entailed?

A. I was the one who approached the front door of her residence and knocked on the door. After we knocked several times Mrs. Flores came to the door. I asked her if this was her home and she said yes and I said, well, we had reason to believe that someone had run to the rear of her house and possibly gone in her house.

Q. By the way, did you converse with Mrs. Flores in Spanish or in English?

A. It was in English.

Q. Did you have any trouble in conversing with Mrs. Flores at that time?

A. No, sir, did not.

Q. This was what hour of the day or night?

A. This was about 2:00 o'clock in the morning.

Q. And did she—did you ask her whether or not she was awake at the time or whether you woke her up or anything like that?

A. No, I didn't ask her anything of that nature at that time.

Q. Did she appear that she had just awakened or had she—did she appear she had been awake for awhile?

A. She did not appear she had been sleeping, but she could have.

Q. What conversation did you next have with Mrs. Flores after you described to her someone had run to the rear of her house and possibly into her house?

A. I asked her if there was a possibility someone was in the house that did not belong there, she did not want there; and she said she did not think so. I then said, well, that would she mind if we came in and looked around to see if there was someone in the house that did not belong there, that if someone had run to the back of the house and gotten in that did not belong in her house.

Q. Did she at anytime—well, what did you next or what conversation did you have in connection with her?

A. She said no—the question was, do you mind if we come in the house and look around, and she said, no, and she opened the screen door so that we could come in.

Q. Was the screen door locked or unlocked or could you tell?

A. It wasn't locked, no, sir.

Q. Did you represent to her that you had a warrant for that premises?

A. No, did not.

Q. Did you tell her he had to let you in by some authority of the law?

A. No, sir.

Q. In other words, you asked her for permission for entry; is that correct?

A. That's correct, yes.

Q. Did you in fact enter the house?

A. Yes, sir.

To like effect, we quote from the testimony of Officer Meaney as follows:

Q. Were you present when Officer Inman had the conversation with Mrs. Flores outside her door and prior to entering the house?

A. Yes, sir, I was.

Q. Did Mrs. Flores seem to understand the questions that were being asked of her?

A. Yes, sir, she did understand.

Q. Did you hear whether or not she gave Officer Inman and yourself ostensibly the right to enter her house?

A. Yes, sir, she did.

Q. And she answered that she was?

A. Yes, sir, that's correct.

\* \* \* \* \* \*

Q. You heard or did you hear Mrs. Flores testify earlier today?

A. I heard some of, most of her testimony I would imagine.

Q. And would you characterize it as being accurate when she said officers appeared at her door and ran inside the house without saying anything to her?

A. That's totally false.

Q. How long would you say the conversation took place between Officer Inman, or anyone that asked her consent, and Mrs. Flores?

A. He talked to her for at least a couple of minutes.

■ In situations such as the present one, in which two conflicting versions of a search have been told, it is the duty of the trier of fact, the trial court, in this instance, to resolve conflicts in testimony. *Stephenson v. State,* 494 S.W.2d 900, 904 (Tex.Cr. App.1973). The trial judge is in the key position to judge a person's demeanor at a motion to suppress evidence hearing, and it is the judge's prerogative, absent an abuse of discretion, to believe the officer's version of the facts and to disbelieve another's version. *Id. McCallum v. State,* 608 S.W.2d 222, 225 (Tex.Cr.App.1980).

But, despite the fact that consent was given, the appellant questions whether the consent was voluntary. It is his assertion that Mrs. Flores was overwhelmed by the arrival of the officers, i.e., seeing uniformed officers and police cars at 2:00 a.m. intimidated her to the point that she consented to their coming into her home.

■ One of the objections appellant urged emphatically is that Mrs. Flores was not aware that she had the right to refuse consent. This same question loomed significantly before the U.S. Supreme Court in the case of *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and the Court decided that, although knowledge of the right to refuse is one factor to be taken into account in deciding whether consent is voluntary, the government need not establish such knowledge as the *sine qua non* of an effective consent.

412 U.S. at 248, 93 S.Ct. at 2058. We hold that Mrs. Flores' lack of knowledge of her right to refuse consent does not taint the subsequent search to the point of excluding items of evidence discovered by such search.

 There are several other considerations looked to by our courts in determining the voluntariness of a consent search: 1) whether a claim of authority to search was made by the officers; 2) whether the officers exhibited a show of force or if coercive surroundings existed, *Clemons v. State,* 605 S.W.2d 567, 570–571 (Tex.Cr.App.1980); 3) whether the police threatened to seek or obtain a search warrant, *Clarence Allen Lackey v. State,* 638 S.W.2d 439 (Tex.Cr. App. 1982); 4) the maturity, sophistication, and mental or emotional state of the consenter, *Schneckloth,* supra.

In the case at bar, the record reflects Officer Inman testified on cross-examination that the officers never told or implied to Mrs. Flores that they had a search warrant, that they never told her or suggested in any manner that they had a right to search the house, and that none of the officers drew his gun. Basically, the only question remaining is whether Mrs. Flores understood what Officer Inman was saying to her. While she had some difficulty at trial in understanding a few of the questions, she was able to answer them after some repetition or rephrasing.

Further, Officer Inman testified that the fluency demonstrated by Mrs. Flores at trial was the same as that exhibited by her in the early morning of the search. Although the questioning was more tedious with Mrs. Flores, the attorneys seemed to obtain all the information they needed from her. Again Officer Inman testified that on the occasion in question Mrs. Flores appeared to have no trouble in understanding him. While admitting that she hesitated to some degree, he testified that he asked questions several times to be certain that there was no misunderstanding between them. Throughout the search Mrs. Flores was right beside him.

We hold that the proof was sufficient to show that the consent of Mrs. Flores was voluntary; there is no suggestion in this record of any abuse of discretion by the trial court. We overrule the appellant's single ground of error.

The State has brought to our attention a mistake in the judgment of the trial court which should be reformed. Instead of reflecting that the appellant pled not guilty, as indicated by the evidence, the judgment incorrectly states that the appellant pled guilty. We are authorized by Tex.Code Crim.Pro.Ann. art. 44.24(b) to reform errors in judgments when the evidence indicates a mistake was made, and order, pursuant to this authority, that this judgment be reformed to show that the appellant pled not guilty.

The judgment is reformed and affirmed.