**Albert Preston CARTER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05-84-00005-CR.**

Court of Appeals of Texas, Dallas.

Nov. 1, 1985.

Robert M. Burns, Dallas, for appellant.

Henry Wade, Crim. Dist. Atty., Constance M. Maher, Asst. Dist. Atty., Dallas, for appellee.

Before ALLEN, HOWELL and ZIMMERMANN, JJ.

ALLEN, Justice.

This is a probation revocation appeal. Appellant, Albert Preston Carter, contends that the trial court, in passing on the State's motion to revoke, abused its discretion by considering evidence seized as the result of an illegal detention. We hold that the detention was not illegal and affirm the trial court's order.

On April 6, 1983, appellant had pleaded guilty to a charge of driving while intoxicated. Based on his plea, the court set punishment at thirty days confinement probated for two years, plus a fine and court costs. It was a condition of probation that appellant commit no offense against the laws of this State.

Appellant was arrested again, though, on May 7, 1983, after the police stopped him at about the 3800 block of Samuels Boulevard in Dallas at a roadblock-type checkpoint. When appellant pulled up, one of the officers on duty checked his license, and in so doing noticed a strong smell of alcohol. The officer asked appellant if he had been drinking, and appellant said he had. The officer then asked appellant to get out of the car and do certain field sobriety tests. Appellant performed unsatisfactorily and was later taken to a police station where he took an intoxilyzer test. Appellant's blood-alcohol concentration measured 0.18 percent.

As a result of this arrest, the State charged appellant with another offense of driving while intoxicated. The State also filed the present motion to revoke probation alleging a subsequent offense of driving while intoxicated. Appellant went to trial for the May offense and the jury found him guilty. At the close of trial, the judge heard the State's motion to revoke probation over appellant's plea of not true. In support of its motion, the State offered all the evidence just heard in the jury trial of the May offense.

Appellant had urged his motion to suppress this evidence *after* its reception in the jury trial, but before the jury heard the charge. The trial court, in ruling on this motion, made oral findings of fact and conclusions of law. While making these findings and conclusions the court observed:

The Court is of the opinion that there is an issue as to whether the police officer set up the driver's license check for the purpose of checking drivers' licenses

or whether they were—were actually trying to ferret out suspected drunk drivers.

In the Court's opinion, it does not matter whether the motives—what the motives of the police officers were, as long as their behavior was legal, and the Court finds that their behavior in setting up the license check and the manner in which the license check was operated were both legal and conformed with—with the law.

The court then overruled appellant's motion to suppress. Appellant re-urged his motion to suppress at the revocation hearing. The trial judge implicity overruled the motion again, saying that "I will take into account the evidence I've already heard in the jury trial ... and carry over ... all the motions and rulings on evidence that were made during the ... jury trial." The court then found that the allegations in the State's motion to revoke probation were true and, consequently, revoked appellant's probation.

█ Appellant did not urge his motion to suppress during the jury trial in a timely fashion, and this court has affirmed the conviction in his appeal of that case. *Carter v. State*, No. 05–84–00004–CR (Tex. App.—Dallas, March 12, 1985, pet. granted). Nevertheless, evidence obtained as a result of an illegal seizure, or initial illegal detention, is not admissible in a probation revocation hearing. *Jones v. State*, 567 S.W.2d 209 (Tex.Crim.App.1978). Appellant's objection in the revocation proceeding was timely; thus, he has preserved his complaint for review. *See Scott v. State*, 543 S.W.2d 128, 129 (Tex.Crim.App.1976).

█ We conclude, however, that we must uphold the trial court's ruling on the motion to suppress. The roadblock was justified under TEX.REV.CIV.STAT.ANN. art. 6687b, § 13 (Vernon Supp.1985) only if the police had set up the roadblock for the *sole* purpose of checking driver's licenses. *Meeks v. State*, 692 S.W.2d 504, 508 (Tex. Crim.App.1985). There was evidence that the police had set up the roadblock solely in order to check driver's licenses.

Leo Savell, a captain in the traffic division of the Dallas police department, who participated in the policy decisions of the Dallas police department regarding driver's license checks, testified that the only reason the Dallas police stop cars at such roadblocks in Dallas is to check driver's licenses. In addition to this direct testimony, two circumstances support the conclusion that a roadblock in this case was set up solely as a driver's license check. First, the police stopped both eastbound and westbound traffic, even though only the eastbound traffic came from an area in which there were bars and liquor stores. The westbound traffic came from a dry, industrial area. Second, the police set up the roadblock from about 4:30 p.m. until 6:00 p.m. The best time to catch intoxicated drivers, according to police testimony, would be from midnight to 2:00 a.m. on a Friday or Saturday night.

There was, to be sure, considerable testimony indicating that checking driver's licenses was not the sole purpose of the roadblock, that catching drunk drivers was at least an additional purpose. Ordinarily, we would deal with this contrary testimony simply by citing the rule that the trial court had the prerogative, absent an abuse of discretion, to believe the testimony supporting his ruling and to disbelieve conflicting testimony. *Taylor v. State*, 604 S.W.2d 175, 177 (Tex.Crim.App.1980); *Zepeda v. State*, 638 S.W.2d 542, 545 (Tex.App.—Houston [1st Dist.] 1982, no pet.). The fact that the trial judge declined to make a finding on the officers' reason for setting up the roadblock, declaring instead that his ruling would rest on other grounds, complicates the matter somewhat but does not compel a different result.

A motion to suppress raises an issue concerning the admissibility of evidence. An appellate court will sustain a judge's ruling that evidence is admissible if there is any basis to support it. *Nickerson v. State*, 645 S.W.2d 888, 890 (Tex.App.—Dallas 1983), *aff'd*, 660 S.W.2d 825 (Tex.Crim. App.1983). Consequently, if the record shows a reasonable basis for upholding a search, an appellate court will uphold it,

even if the trial court's *grounds* for denying the motion to suppress were erroneous. *Cf. Nickerson,* 645 S.W.2d at 891 ("an appellate court may use the entire trial record to uphold a search even though the trial court erroneously denied the motion to suppress on the lesser amount of evidence presented at the pre-trial hearing"). There was testimony in the present record to support the conclusion that the police set up the roadblock solely for the purpose of checking driver's licenses. Consequently, there was a reasonable basis to support the trial court's denial of the motion to suppress and admission of the challenged evidence.

Moreover, even if we were to assume that the trial court erred in admitting this evidence, the error would be harmless. The State had properly introduced, in the probation revocation hearing, appellant's April conviction and the terms of his probation. The trial court had, earlier in the day's proceedings, received the jury's guilty verdict and pronounced judgment and sentence on appellant. This judgment and sentence were thus before the court as it ruled on the motion to revoke probation. The judgment and sentence in themselves were a sufficient basis for the trial court to find, from a preponderance of the evidence, that appellant had committed an offense against the laws of the State of Texas. An appellate court will sustain a probation revocation on the basis of an immediately preceding conviction in the same court, despite the fact that the conviction was on appeal at the time of the revocation, if, at the time of the *appeal* of the *revocation,* there exists no contest to the sufficiency of the evidence in the *conviction. Haile v. State,* 556 S.W.2d 818 (Tex.Crim.App.1977). In his appeal of his April, 1983, conviction for driving while intoxicated, appellant presented no ground of error challenging the sufficiency of the evidence. *Carter v. State,* No. 05–84–00004–CR (Tex.App.—Dallas, March 12, 1985, pet. granted). He did not, in his appeal, pray that this court render a judgment of acquittal upon suppression of the evidence he claimed the trial court had admitted erroneously. Nor did he make

such a prayer in his petition for discretionary review to the Court of Criminal Appeals. Thus, now there does not exist, in any way, a contest to the sufficiency of the evidence in that conviction. We must therefore regard the conviction as a sufficient basis for the trial's probation revocation in the same proceeding. We must, as a result, hold that the trial court did not err in revoking appellant's probation. We overrule appellant's sole ground of error.

Affirmed.

Howell, J., dissents.

HOWELL, Justice, dissenting.

I dissent. The majority has misread *Haile v. State,* 556 S.W.2d 818 (Tex.Crim.App.1977). It has erroneously interpreted *Nickerson,* 645 S.W.2d 888 (Tex.App.—Dallas 1983), *aff'd* 660 S.W.2d 825 (Tex.Crim.App.1983), as authority to imprison without an affirmative finding upon a fact issue which the State had the burden to prove. Lastly, the author submits that the disputed fact issue must be resolved in the appellant's favor.

Although the *Haile* opinion is not entirely clear, a close analysis shows that it has no application to the case at hand. In that case the, State moved to revoke, pleading the *facts* of subsequent criminal conduct. When the motion was filed, there had been no trial or conviction for that subsequent conduct. After Haile's conviction on the subsequent offense, the State's motion to revoke was heard. At the hearing, the State only offered evidence that a conviction had occurred. Thus, the defendant's contention on appeal was apparently aimed at the variance between the pleading and the proof in the revocation proceedings. That fact situation is wholly unrelated to the case at bar where the State relies not on the conviction; it both pleaded and offered evidence of criminal misconduct—evidence that should have been suppressed leaving no basis for the order of revocation.

The Court of Criminal Appeals affirmed in *Haile,* primarily, as the writer understands the opinion, upon a harmless error theory. First, the court held that the evidence heard at the trial of the subsequent offense was before the court hearing the motion to revoke, even though it was not formally offered, because the same judge and the same defense attorney were involved in each proceeding. Secondly, the subsequent offense had been affirmed before the revocation appeal was decided. There was no further room to question the sufficiency of the evidence to support a revocation. Therefore, concluded the *Haile* court, the defendant's having been charged on the underlying facts and adjudicated solely upon the grounds of a conviction constituted harmless error. Analysis reflects that *Haile* does not stand for the proposition which the majority has reached on strength of *Haile.*

*Haile* does contain an unqualified holding:

> It is clear that the verdict of guilty [at the trial of the subsequent offense] was on appeal at the time of [the hearing of] the motion to revoke, and therefore it could not be used to support the revocation.

*Haile,* 556 S.W.2d at 820. The majority holding that revocation will be sustained on the basis of a subsequent conviction despite the conviction's pending appeal conflicts with the majority's own authority.

*Nickerson,* 645 S.W.2d at 888, has likewise been taken out of context. The trial court in the present case made a fact finding but not an ultimate fact finding. It stated in effect: I find as a matter of fact ("The court is of the opinion") that there is a disputed question of fact ("an issue") regarding the purpose of the license check procedure but I refuse to pass upon the question because I find as a matter of law that "it does not matter ... what the motives of the police officers were...."

The majority concedes that the trial court erred in its ruling upon the law. It affirms because, in the majority's opinion, there is evidence from which the trial court *could*

have found against appellant. Would the majority uphold a jury verdict of guilt where an element of the crime has been omitted from the charge on grounds that the record contains evidence, which, if believed, by the jury, *could* (not would or should but could) have supported a finding against the defendant?

There is no distinction. Where evidence is seized without a warrant, and the method of seizure is called into question, the State is burdened to show that the seizure was made in compliance with the Fourth Amendment. *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971). The majority concedes that the challenge was timely with respect to the revocation proceeding whereas it was not timely in the trial of the subsequent offense. It follows that as the State pleaded, and therefore must rely, not on the subsequent conviction, but on the facts underlying that conviction, the appellant is entitled to a trial upon the facts of his timely motion to suppress. The majority opinion deprives him of such a trial, thereby denying the appellant procedural due process.

The paramount question is the application of the recent cases of *Meeks v. State,* 692 S.W.2d 504 (Tex.Crim.App.—1985,) and *Webb v. State,* 695 S.W.2d 676 (Tex.App.—Dallas, 1985). Both of those cases found driver's license checkpoint operations to violate the Fourth Amendment. *Webb* is factually the closer case because it specifically involved checkpoint operations with a purpose of apprehending intoxicated drivers. This court there held that a purported driver's license roadblock checkpoint operation constitutes an unreasonable seizure of the defendant if actually operated for the purpose of checking for violations of the law against driving while intoxicated. The operations carried out in the case before us are indistinguishable from those in *Webb* and *Webb* should be held controlling.

The evidence before us compels the conclusion that the driver's license check in this case was a thinly veiled operation to enforce the D.W.I. laws. Six police offi-

cers testified about its purpose—the arresting officer, the sergeant in charge of the group conducting the operation, who was also present and assisting at the scene, an officer who administered the intoxilyzer test to appellant, plus the traffic division lieutenant, the captain, and the deputy chief, who were respectively the next highest officers in command over this particular group. Each of them testified that the checkpoint operation was simply a drivers license check and that it was not conducted to apprehend DWI violators. However, virtually all of the circumstances point in the opposite direction.

The arresting officer testified that the checkpoint was operated by a selective enforcement unit devoted to the apprehension of D.W.I. offenders. All seven or eight officers on the scene were members of that unit. One of the officers on the scene was a certified intoxilyzer operator and he ultimately administered the test to appellant.

Although the traffic division captain testified that the ordinary practice of the Dallas Police is to issue traffic citations to persons found driving without licenses rather than arresting them on the spot, the arresting officer nevertheless testified that a police van had been brought to this location for the purpose of transporting arrestees. The arresting officer further testified that following appellant's arrest, he was placed in the van and kept there until six or seven persons had been apprehended and placed in the van. Most of the persons placed in the van had been arrested for D.W.I. Rather than transport the arrestees directly to jail—the standard arrest procedure, the van carried the arrestees to a special substation where intoxilizer tests were generally performed. When asked if this was the place where people were normally taken after arrest, the arresting officer replied, "If they're arrested by our unit it was." When asked if any of the people placed in the van were released without charges being filed, he replied: "If they passed the [intoxilyzer] test, they were released."

The checkpoint operation was conducted on a thoroughfare containing "a whole row of beer joints and liquor stores." This particular unit had worked this location on a number of previous occasions. While the arresting officer denied that the purpose of the checkpoint operation was to apprehend D.W.I. violators, he conceded that getting "the drunks off the road" was "one of the objectives of the D.W.I. unit, yes."

The sergeant testified that when his unit ran "driver's license checks" that they were normally operated from an hour to an hour and a half. He testified that his unit had been conducting checkpoint operations on and off for several years. He testified that the department has pinpointed several areas within the City of Dallas for such checks and that one of them was the 3800 block of Samuels Boulevard. At that time, it was one of the five selected target areas "for enforcement by our squad." "Of D.W.I's?" "And traffic violations, yes." The location of checkpoints had been changed over the years "based on alcohol-related fatalities and serious injuries involved in other violations." The sargeant conceded that the other four regular checkpoint locations at that time were all in areas where numerous or some alcohol-dispensing businesses were operated. His principal contention was that the D.W.I. enforcement unit conducted driver's license checks in order to determine whether D.W.I. arrestees whose licenses had been suspended were continuing to drive.

The lieutenant testified that he participated in meetings with other officers regarding setting up driver's license checkpoints. After being reminded, he reluctantly testified that he had stated to the media that the purpose of these checkpoint operations "is to get the drunks off the road." He conceded that one of the criteria used in selecting checkpoint locations was that there were bars and nightclubs in the area. "We figured ... there would be a higher population of possible D.W.I.'s in that area, yes."

The deputy chief testified that checkpoints are basically set up in areas where

"there's a high consumption of alcoholic beverage," and that "the purpose of the check points is to let people who frequent these areas know that the officers are there and that it would be to your advantage to control your drinking."

The captain conceded that all of the checkpoints operated by the specialized unit were in the areas of nightclubs and bars but when asked if the real reason for the stops is to get drunks off the road, he replied "that's not the reason, no."

The officer who administered the intoxilizer to appellant testified "we had had a license check and I was op—operating the intoxilizer." He testified that he had been "out there on Samuel Boulevard" and that he had made arrests out there, but did not recall the number. He testified that he was not the only qualified intoxilizer operator present at the scene.

Appellant urged that the checking of drivers' licenses was a subterfuge and that the real purpose of the checkpoint was to apprehend D.W.I. violators. As already stated, the trial court refused to rule upon the purpose of the checkpoint operation stating that the officer's "motives" were irrelevant.

Applying *Meeks* and *Webb*, it is apparent in hindsight that the court erred in its ruling. It might be appropriate to abate the appeal and remand to the trial court for a further factual determination in light of subsequent authority, as suggested by the *Webb* dissent. However, it is an appellate court's function to evaluate all the circumstances to determine how the trial judge might have ruled the search valid. *Nickerson v. State*, 645 S.W.2d 888 at 891. An evaluation of the entire record shows that, on the evidence presented, and the law as found in the subsequent decisions, the trial court would have been obligated to sustain the motion to suppress.

> ... At the outset, the most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject

only to a few specifically established and well delineated exceptions." Thus, the burden is on the State to show facts authorizing the warrantless seizure of the evidence which is challenged in the present case.

*Webb v. State*, at 681 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 444–45, 91 S.Ct. 2022, 2027, 29 L.Ed.2d 564 (1971)); *see also DeLao v. State*, 550 S.W.2d 289, 291 (Tex.Crim.App.1977). When the complete evidence is analyzed, it becomes obvious that the State did not discharge its burden of proving the search to be reasonable.

Although the officers all insisted that they were only conducting a driver's license check and that any other purpose was merely incidental, almost all of the circumstances indicate to the contrary. The unit to which the officers belonged, the presence of the van, the fact that intoxilizer operators were on the scene, the locations selected, and the public statement by the supervising officer of the objectives of the program all point in one direction.

The only circumstances militating in the opposite direction are that the checkpoint operation was conducted around 5 p.m., during daylight hours and that traffic in both directions was stopped. One officer testified that if the check had been for the purpose of apprehending D.W.I.'s, it would have been conducted between 10:00 p.m. and midnight. However, we must note that May 7, 1983, was a Saturday, a day when many people have just received their paychecks, a day when many people are off work and have time to relax, a day when alcohol consumption is likely to increase. We further note the testimony of another officer that the D.W.I. enforcement unit had variable hours, starting work on some days as early as 2 p.m. and working as late as 3 o'clock a.m. on other days. There was also testimony that the unit often operates checkpoints by night. Thus, any probative force arising from the fact that appellant was arrested in a daylight checkpoint operation becomes equivocal, at most. Likewise, the fact that traffic in both directions

was stopped adds but little; the facts remain that this location was chosen and operated by the D.W.I. enforcement unit in close proximity to numerous alcohol dispensing establishments.

It is a basic proposition, that purpose, intent, motive and all other questions as to state of mind must be proved indirectly. Unless the actor is willing to admit that he was possessed of the mental state contended by his opponent, the actor's actual state of mind must be proven by inference and that proof must of necessity rest solely upon circumstantial evidence.

... [T]here are cases every day occurring, where the testimony of a witness testifying positively to an asserted fact as transpiring within his view ... is disproved and falsified by proof of facts and circumstances known to exist, and the existence of which is wholly incompatible with the fact deposed to. In such cases, circumstantial evidence outweighs positive testimony.... The saying often quoted, but with most perverse application, both in ordinary conversation and in argument at the bar, "that circumstances never lie, but that a witness may," is, when stated with legal precision, a truth.

*Coles v. Perry*, 7 Tex. 109, 168 (1851).

It is also necessary in weighing testimony to consider where the interest lies. The law enforcement authorities desire to continue these checkpoint operations because they consider that they are effective in apprehending intoxicated drivers. The use of checkpoints simplifies their work in "getting the drunk drivers off the streets." However, the entire purpose of the Fourth Amendment is to balance the security of the individual against the needs of the community. Our courts having decided checkpoints for the incidental purpose of ferreting out D.W.I. violators and other offenders are unconstitutional, we must not proceed to open the door open for our rulings to be freely circumvented. That which cannot be done directly may not be done indirectly. Wholesale random stops of drivers in order to check for possible intoxication

are impermissible. *Webb v. State*, at p. 683.

It is wholly unnecessary to question the veracity of these officers in order to reach the conclusion that the State failed to prove, beyond a reasonable doubt that the sole reason for this warrantless detention was to check driver's licenses. Beyond a reasonable doubt was the proper measure of the State's burden. *Coolidge*, 403 U.S. at 454–55, 91 S.Ct. at 2031–32. In almost every prosecution, the State has the burden of proving intent, motive or purpose and to make its proof beyond a reasonable doubt. The accused is permitted to take the stand and deny that he was possessed of a culpable state of mind if he so desires. However, the law pays scant attention to his denial of intent to kill, intent to defraud by worthless check, etc. *unless his testimony is corroborated by the circumstances.*

The same proposition applies here. Obviously, the circumstances are such that they create reasonable doubt as the purpose of the stop under challenge. Inasmuch as the testimony of the officers comports with their natural inclination to facilitate the arrest of offenders and there is no means to directly prove or disprove their state of mind, circumstantial evidence outweighs direct evidence, reasonable doubt persists and the motion to suppress must be granted.

Although a driver's license check is unlawful when conducted for the specific purpose, it becomes unlawful when combined with another purpose. The Court of Criminal Appeals has made it abundantly clear that license checks are to be made solely to enforce license regulations. "If a license check is not the sole reason for a detention, that detention is not authorized by the statute and cannot be upheld." *Meeks v. State*, 692 S.W.2d 504, 508 (Tex.Crim.App. 1985). Clearly, this checkpoint operation does not meet the "sole reason" test.

This writer very well might have been disposed to remand for a new suppression hearing before *Meeks* and *Webb* were decided. However, in light of those decisions, we are obligated to affirmatively hold that

all evidence obtained through the purported driver's license check must be suppressed.

I dissent. The case should be reversed and remanded with instructions to grant the motion to suppress and for further proceedings not inconsistent herein.