Bernhardt **TIEDE, II,** Appellant,

v.

The **STATE** of Texas, Appellee.

No. 12–99–00182–CR.

Court of Appeals of Texas, Tyler.

June 30, 2000.

Appellant's Discretionary Review Refused Nov. 8, 2000.

Appellee's Discretionary Review Granted Nov. 8, 2000.

---

4. *Id.,* at 81 n. 11.

5. *Id.,* at 80.

6. *Id.,* at 82.

Clifton L. Holmes, Longview, Eric M. Albritton, Albritton & Albritton, Rockwall, for Appellant.

Danny Buck Davidson, Carthage, for state.

Panel consists of RAMEY, C.J., HADDEN, J., and WORTHEN, J.

HADDEN, Justice.

Appellant Bernhardt Tiede, II appeals his conviction for the murder of Marjorie Nugent. Appellant pleaded not guilty to the charged offense. After a change of venue to San Augustine County, the jury found Appellant guilty and sentenced him to confinement for life in the Texas Department of Criminal Justice–Institutional Division ("TDCJ ID") and a $10,000 fine. Appellant complains on appeal that the trial court erred in (1) overruling his challenges to the jury composition based on *Batson v. Kentucky;* (2) admitting his confession which he contends was taken after he had invoked his right to counsel; and (3) refusing to admit certain testimony of his psychologist at the punishment phase. We will reverse the judgment of the trial court as it pertains to punishment and remand the case to the trial court for a new hearing on punishment only.

### FACTUAL BACKGROUND

Appellant became the companion of Marjorie Nugent ("Nugent") of Carthage in approximately 1990. In 1993, Appellant left his job at Hawthorn Funeral Home to work for Nugent. They shopped together

and traveled together extensively. In November of 1996, Nugent was reported missing. The Panola County Sheriff investigated her disappearance, and in the course of that investigation, talked to Appellant on several occasions. Appellant first said that Nugent was visiting a relative. He later told officers that Nugent had had a stroke and was recovering at Scott & White Hospital in Temple. On August 18, 1997, sheriff's officers found Mrs. Nugent's body in her own freezer. She had been shot four times in the back. Captain David Jeter interrogated Appellant, who ultimately confessed to shooting Nugent.

### APPELLANT'S CHALLENGE TO THE STATE'S USE OF PEREMPTORY STRIKES

In his first four points of error, Appellant contends that the court erred in overruling his objections to the State's use of its peremptory strikes. Specifically, Appellant complains that the State engaged in purposeful discrimination when it struck prospective jurors Allen Roberts, Gregory Johnson, and Rayford Roberts on the basis of their race and religion. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

### 1. Standard of Review

When reviewing a *Batson* challenge, a reviewing court must afford great deference to the trial court's determination of discriminatory intent. *Alexander v. State*, 866 S.W.2d 1, 8 (Tex.Cr.App.1993). The trial court must assess the credibility and content of the State's explanation of its strikes and all other relevant facts and circumstances. *Id.* The reviewing court will not disturb the trial court's decision unless it is clearly erroneous. *Esteves v. State*, 849 S.W.2d 822, 823 (Tex.Cr.App. 1993). A ruling is only clearly erroneous if, after searching the record, the appellate

court has a definite and firm conviction that a mistake has been made. *Hill v. State*, 827 S.W.2d 860, 865 (Tex.Cr.App. 1992). If the trial court's ruling is supported by the record, the prosecutor's explanation of his strikes, appellant's evidence, and any impeaching evidence, the ruling is not clearly erroneous. *Cantu v. State*, 842 S.W.2d 667, 689 (Tex.Cr.App. 1992).

### 2. Applicable Law

The Equal Protection Clause prohibits the State from exercising its strikes solely on the basis of race. *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). However, neither *Batson* nor its progeny condemns peremptory challenges based on religious belief. *Goff v. State*, 931 S.W.2d 537, 552 (Tex.Cr.App.1996), *cert. denied*, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); *Casarez v. State*, 913 S.W.2d 468, 496 (Tex.Cr.App.1995) (op. on reh'g). To challenge the prosecution's exercise of its peremptory strikes, a defendant must make a *prima facie* showing that the State exercised its peremptory challenges in a discriminatory manner. *Batson*, 476 U.S. at 96, 106 S.Ct. 1712; *Harris v. State*, 827 S.W.2d 949, 955 (Tex. Cr.App.1992). A defendant establishes a *prima facie* case by showing facts and circumstances that raise an inference that the State used its strikes to exclude prospective jurors on the basis of race. *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722 (1986). *See, e.g., Dewberry v. State*, 776 S.W.2d 589, 591 (Tex.Cr.App.1989) (*prima facie* case found where five of six eligible black venirepersons were struck by the State); *Miller–El v. State*, 748 S.W.2d 459, 460 (Tex.Cr.App. 1988) (where State struck ten of eleven eligible black venirepersons, defendant es-

tablished *prima facie* case of discrimination).

■■■ Once a defendant makes a *prima facie* showing of discrimination, the burden of production shifts to the State to demonstrate a race-neutral explanation for its exercise of the strike. *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). The explanation need not be persuasive or even plausible. *Id.; Rodriguez v. State,* 919 S.W.2d 136, 140 (Tex. App.—San Antonio 1995, no pet.). *See, e.g., Lee v. State,* 949 S.W.2d 848, 850 (Tex.App.—Austin 1997, pet. ref'd) (State did not exercise its strike on the basis of race where prosecutor struck black male juror with two earrings, but did not strike white male juror with only one earring); *Tate v. State,* 939 S.W.2d 738, 745 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) (a prospective juror's inattentiveness was a sufficiently race-neutral reason to justify the use of a peremptory strike); *Newsome v. State,* 829 S.W.2d 260, 265 (Tex.App.—Dallas 1992, no pet.) (a juror's carelessness or error in completing the juror information card is also a race-neutral reason for exercising a strike). If the State provides a race-neutral explanation for its strikes, the defendant has the burden to rebut the State's explanation or to show the explanation was merely a sham or pretext. *See Williams v. State,* 804 S.W.2d 95, 101 (Tex.Cr.App.1991). In order to prevail, the defendant must persuade the trial court by a preponderance of the evidence that the allegations of purposeful discrimination are true. *Williams v. State,* 767 S.W.2d 872, 874 (Tex.App.—Dallas 1989, pet. ref'd). A defendant does not meet this burden by merely disagreeing with the State's explanation for its strike. *Webb v. State,* 840 S.W.2d 543, 544 (Tex.App.—Dallas 1992, no pet.).

■■■ In order to evaluate a *Batson* challenge, an appellate court may consider whether the prosecutor questioned potential jurors and whether he treated non-minority veniremembers similarly to those of a minority. *Esteves,* 849 S.W.2d at 823–24. A viewing court cannot automatically imply racial bias in every situation where one of the State's reasons for using a peremptory challenge would technically apply to an unchallenged member of the venire. *Esteves,* 849 S.W.2d at 824 n. 2. A prosecutor who exercises strikes in a disparate manner on the basis of a single factor does exhibit racial bias. *Id.* Conversely, the State's offer of multiple reasons for striking a particular person indicates a lack of disparate treatment. *Cantu,* 842 S.W.2d at 689. When the State offers numerous race-neutral reasons for challenging a potential juror, the fact that other jurors possessed one or more of the objectionable attributes is not sufficient to establish disparate treatment. *Cantu,* 842 S.W.2d at 689 ("It is unlikely that two venirepersons on one panel will possess the same objectionable attribute or character trait in precisely the same degree. Such quantitative distinctions may cause a prosecutor to challenge one venireperson and not the other.")

In the present case, the trial court excused various members of the venire for cause. Of the 32 persons that remained in the strike zone, 15 were African Americans. The record does not reflect the racial makeup of the remaining 17 members. The State used 8 of its 10 available strikes on African Americans. After the exercise of peremptory strikes by the State and defense, 7 of the 12 jurors selected were African Americans, as was one alternate. Appellant objected that the State had violated **Batson** in the exercise of its strikes.

**Venireperson Allen Roberts**

■■■ Regarding his exercise of a peremptory strike on Allen Roberts, the pros-

ecutor said, "He seemed disinterested in everybody's testimony. Not just mine. His religious affiliation he put as 'black.' His body English was bad. He has a gold chain and two earrings." Thereafter, defense counsel testified to dispute the prosecutor's observations of the prospective jurors. He stated that he paid particular attention to the demeanor of the black jurors because this is often used as a pretext by prosecutors. He stated that he observed Allen Roberts to be attentive. Defense counsel stated that Allen Roberts' body language was similar to that of several others who were accepted by both sides. He also testified that several male members of the venire wore earrings, including one male juror who was accepted by the prosecutor.

Appellant failed to prove that the State's use of a strike on Allen Roberts was discriminatory. The prosecutor stated numerous reasons for his strike of the juror. Disinterest, body language, and earrings worn by male jurors can be race-neutral reasons for striking a juror. Defense counsel disagreed with the prosecutor's assessment of Allen Roberts' demeanor and interest, but his mere disagreement is insufficient to establish purposeful discrimination. *See Webb*, 840 S.W.2d at 544. Regarding Appellant's contention that the State discriminated against him on the basis of religious affiliation, *Batson* does not prohibit the exercise of strikes on the basis of religion. *See Casarez v. State*, 913 S.W.2d at 496. We hold that the trial court did not err in overruling Appellant's objection to the State's exercise of its strike on Allen Roberts.

**Venireperson Gregory Johnson**

■ The prosecutor explained his strike of Gregory Johnson ("Johnson") in the following manner: "He lists no religion. We think religion is important in this case. His body English; he seemed

disinterested." Regarding the importance placed on religion by the prosecutor, Appellant points out in his brief that the prosecutor did not make an issue of religion during his voir dire, but only asked one question about religion. He asked whether any juror would be unable to sit in judgment of another and assess punishment because of his religious beliefs. Two jurors answered in the affirmative, but Johnson did not answer this question. Defense counsel disputed the prosecutor's opinion that Johnson was disinterested and testified that he observed him to be attentive.

■ The record reflects that the State struck two of the three members of the venire who left blank the space for their religious preference. There is no evidence, however, that the State struck only African American persons who failed to indicate a religious association, and this Court is unable to impute discriminatory intent to the State without evidence of disparate treatment. Further, although Appellant disagreed with the prosecutor's assessment of Johnson's demeanor, the trial court was present and had the opportunity to observe Johnson and the attorneys. This court affords great deference to the trial court's assessment of the credibility of witnesses. Therefore, we hold that Appellant failed to establish purposeful discrimination by the State in the exercise of its strike of Johnson.

**Venireperson Rayford Roberts**

■ Regarding Rayford Roberts, the prosecutor said, "He has two earrings and he appeared to be-he slept. He was asleep; his body English; he seemed disinterested." In response to the prosecutor's explanation of this strike, defense counsel testified that he did not observe Rayford Roberts sleeping. He further stated that there was at least one man

eventually seated on the jury that had an earring. Again, Appellant's dispute about the potential juror's body language is insufficient to prove purposeful discrimination. Neither is there sufficient evidence regarding the persons that wore earrings to establish the State's disparate treatment of Rayford Roberts.

Based on the evidence before this court, we do not determine that the trial court was clearly erroneous in overruling Appellant's objections to the venire. Therefore, we overrule Appellant's first, second, third, and fourth points of error.

### ADMISSIBILITY OF APPELLANT'S CONFESSION

In his fifth point of error, Appellant contends that his confession was inadmissible because it was obtained by police interrogation after he had invoked his right to counsel. Specifically, Appellant argues that he indicated that he wanted to speak with a lawyer during Jeter's initial interrogation and that Jeter recommenced interrogation.

### 1. Standard of Review

An appellate court reviews motions to suppress illegal statements under the standard set forth in *Guzman v. State.* 955 S.W.2d 85, 87 (Tex.Cr.App.1997). *See also Loserth v. State,* 963 S.W.2d 770, 771 (Tex.Cr.App.1998) (holding *Guzman* standard applies to all motions to suppress). Under *Guzman,* an appellate court should show "almost total deference" to a trial court's determination of historical facts based on an evaluation of the witnesses' credibility and demeanor. 955 S.W.2d at 89. However, when considering a question of law or a mixed question of law and fact that is not reliant upon an evaluation of a witness's demeanor, the appellate court should review the lower court's ruling *de novo. Id.* An appellate court will sustain a judge's ruling that evidence is admissible if

there is any basis to support it. *Carter v. State,* 700 S.W.2d 289, 291 (Tex.App.—Dallas 1985, pet. dism'd). Therefore, if the record shows a reasonable basis for denying a motion to suppress, the appellate court will uphold it, even if the trial court's grounds for denying the motion were erroneous. *Id.*

### 2. Applicable Law

Prior to a custodial interrogation, an accused must be advised that he has the right to consult with an attorney. *Miranda v. Arizona,* 384 U.S. 436, 467–68, 86 S.Ct. 1602, 1624–25, 16 L.Ed.2d 694, 720 (1966); *Russell v. State,* 727 S.W.2d 573, 575 (Tex.Cr.App.1987). Interrogation must cease immediately if a suspect indicates that he wants an attorney. *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1628. However, the request for counsel must be clear and unambiguous. *Russell,* 727 S.W.2d at 575. The mere mention of the word "lawyer" is insufficient to invoke the right. *Id.* There are no magic words required to invoke the right to counsel, and each case must be determined on an analysis of all the facts and circumstances. *Collins v. State,* 727 S.W.2d 565 (Tex.Cr.App. 1987); *see, e.g., Davis v. United States,* 512 U.S. 452, 455, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 368 (1994) (held that "maybe I should talk to a lawyer," was too ambiguous to invoke right to counsel); *but see Jones v. State,* 742 S.W.2d 398, 405–06 (Tex.Cr.App.1987) (statement, "I think I want a lawyer," was held to be a clear and unequivocal assertion of right to counsel). Once a suspect invokes his Fifth Amendment right to counsel, the police cannot interrogate him further until counsel has been provided for him, or until the suspect himself initiates further communications, exchanges, or conversations with the police. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68

L.Ed.2d 378 (1980); *Guidry v. State*, 9 S.W.3d 133, 143 (Tex.Cr.App.1999), *petition for cert. filed* (U.S. May 9, 2000). "This rule seeks to ensure 'that any statement made in a subsequent interrogation is not the result of coercive pressures.'" *Muniz v. State*, 851 S.W.2d 238, 252–53 (Tex.Cr.App.1993), *quoting Minnick v. Mississippi*, 498 U.S. 146, 149–50, 111 S.Ct. 486, 489, 112 L.Ed.2d 489 (1990).

Captain David Jeter ("Jeter") of the Panola County Sheriff's Department conducted two interviews with Appellant. At the first interview, Jeter read Appellant a form containing certain rights, including the right to remain silent and the right to have a lawyer advise him before and during any questioning. Jeter read Appellant each right, asked him if he understood it, then placed a check next to the number associated with that right. Appellant read the form and initialed each check. Appellant testified that, during the course of the first interview, he told Jeter, "I think I need a lawyer."[1] Jeter terminated the interview immediately. Appellant had previously consented to the search of his residence, and Jeter had advised him that he was going to conduct the search. Appellant asked Jeter to let him know what they found at his home. After the search, Jeter returned to the detention center to tell Appellant what they had found at his house. As Jeter began discussing the list of items, Appellant stated that he wanted to tell Jeter what had happened. Jeter advised him that he could not talk to him unless he waived his right to counsel. Sheriff Paul Ellett ("Ellett") repeated this warning to Appellant. Then, in the presence of Jeter and Ellett, Appellant twice stated that he wished to make a statement. Jeter went through a formal reading and

waiver of Appellant's rights. Thereafter, Appellant dictated his statement to Jeter. On the advice of Texas Ranger Ronnie Griffith, Jeter wrote at the beginning of the statement, "I had requested a lawyer before, but have waived my right to an attorney, and have asked to give this statement to Capt. Jeter of my own free will." Appellant signed the statement. The trial court denied the motion to suppress, finding that Appellant did not make a clear and unequivocal invocation of the right to counsel.

Although not in the clearest of terms, Appellant invoked his right to counsel with the words, "I think I need a lawyer." *See Jones*, 742 S.W.2d at 405–06. It was, therefore, appropriate for Jeter to terminate the interview. However, Appellant re-opened the conversation by asking Jeter to let him know what they found at his home. When Appellant told Jeter that he wanted to tell him what happened, Jeter again advised him of this right. Jeter called Ellett, who also told Appellant that he had to waive his right to counsel. Appellant said he wanted to talk and waived his right to counsel. The particular facts and circumstances of this case demonstrate that Appellant initiated the second interrogation about the offense. Various officers informed Appellant of his rights on numerous occasions. The record also shows that appellant knowingly and intelligently waived his right to counsel. Although the trial court stated an erroneous ground for denying the motion to suppress, this court will uphold that order because it was otherwise supportable. *See Carter*, 700 S.W.2d at 291. We therefore hold that the trial court properly admitted Appellant's confession, and overrule Appellant's fifth point.

1. Jeter's report and the testimony of Texas Ranger Ronnie Griffith support this version of events. However, at the suppression hearing, Jeter testified that Appellant asked, "David, do you think I need an attorney?"

### Neuropsychologist Testimony Offered at Punishment Stage

In his sixth and seventh points of error, Appellant contends that the trial court erred by excluding certain expert testimony about his lack of future dangerousness and mitigating mental disorder. Specifically, Appellant alleges that the trial court violated his constitutional right to present his defense and erroneously excluded evidence appropriate to a determination of punishment under Texas Code of Criminal Procedure article 37.07, § 3(a). Prior to the testimony of Dr. Frederick Mears ("Mears") before the jury, the prosecutor examined the witness on voir dire. Mears stated that he was a clinical neuropsychologist and that he had doctorate degrees in psychology and neuropsychology. Mears examined Appellant three times and administered numerous psychological tests to him. He stated that he would testify about Appellant's mental state and relation to traditional mental disorders as of the time of the offense. Mears was prepared to testify as follows: 1) regarding the issues of "sudden passion" and "adequate cause," Appellant's capacity for cool reflection was degraded or diminished by the stress of his relationship with Nugent and the demands that she placed on him; 2) regarding the issue of Appellant's future dangerousness, Appellant posed no danger to anyone in the prison system; and 3) regarding Appellant's behavior after the offense, Mears would testify that Appellant had experienced certain dissociative episodes in which he mentally separated from the act of killing Nugent. This last factor was in direct response to the State's continued characterization of Appellant as a person who could kill Nugent in a cold, calculating fashion and then appear with a normal, undisturbed demeanor and conduct his usual business without effect. Mears defined dissociative disorder as follows:

a situation in which the person can really more or less become somewhat different than they normally were, and it is an identified disorder as listed in the American Psychiatric Association's DSM4

. . . .

So some people can become dissociative, and that means they really are sort of engaging in a high level of repression where they can almost develop two different aspects of themselves. Not a Dr. Jeckel Mr. Hyde kind of thing. But can have two different kinds of personalities so to speak, or different kinds of behavior, and in some cases, that can be stress-induced behavior.

The State objected to Mears' testimony on the ground that it was not admissible under Texas Rule of Evidence 702 in that it was not helpful to the jury. The trial court allowed Mears to testify about dissociative behavior in general, but did not allow him to discuss his examination, testing, or evaluation of Appellant specifically.

#### 1. Standard of Review

An appellate court reviews a trial court's exclusion of evidence for an abuse of discretion. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Cr.App.1990). An abuse of discretion is established "only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Cr.App.1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993).

#### 2. Evidence Allowed At Punishment Phase of Trial

At the punishment phase of a criminal trial,

evidence may be offered by the state and the defendant as to any matter the

court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, and opinion regarding his character, the circumstances of the offense for which he is being tried, and ... any other evidence of an extraneous crime or bad act.... Tex.Code Crim. Proc. Ann. art. 37.07, § 3(a) (Vernon Supp.2000). Relevant evidence is that evidence that has a tendency to make a fact of consequence more or less probable than it would be without the evidence. Tex.R. Evid. 401. However, there are no facts of consequence at the punishment phase of a criminal trial. *Miller–El v. State*, 782 S.W.2d 892, 895 (Tex.Cr.App. 1990). Evidence is relevant to the assessment of punishment if it provides information about the defendant's life and characteristics. *Brooks v. State*, 961 S.W.2d 396–400 (Tex.App.—Houston [1st Dist.] 1997, no pet.).

The Legislature has declared that the issue of sudden passion is relevant to punishment. At the punishment phase of a murder trial, the defendant may prove that he caused the death under the immediate influence of sudden passion arising from an adequate cause. Tex. Pen.Code Ann. § 19.02(d) (Vernon 1994). If the defendant obtains an affirmative finding on sudden passion, the offense is punishable as a second degree felony, instead of a felony of the first degree. *Id.*

 Further, an expert witness's opinion on the future dangerousness of a defendant is proper evidence at the punishment phase. Jurors may consider what sentence will punish the defendant and what sentence is appropriate to deter future criminal conduct of a defendant. *Lopez v. State*, 860 S.W.2d 938, 946 (Tex. App.—San Antonio 1993, no pet.). An expert may testify at the punishment stage of trial about a particular defendant's pro-

pensity to commit violence in the future. *Wunneburger v. State*, 844 S.W.2d 864, 869 (Tex.App.—Amarillo 1992, pet. ref'd). However, an expert witness may not recommend a particular punishment to the jury. *Id.* If a defendant cannot be rehabilitated, the jury may extend his sentence to protect society. *Lopez*, 860 S.W.2d at 946.

 Rule 702, governing testimony by experts, requires that such testimony be helpful to the jury. Tex.R. Evid. 702; *Perkins v. State*, 902 S.W.2d 88, 93 (Tex. App.—El Paso 1995, pet. ref'd). The trial court must determine whether the proffered expert testimony is sufficiently reliable and relevant to help the jury in reaching accurate results. *Jordan v. State*, 928 S.W.2d 550, 555 (Tex.Cr.App.1996).

On the State's objection that Mears' testimony would not be helpful to the jury, the court ruled that Mears could testify generally about certain psychological disorders, but not as they applied to Appellant. Mears testified regarding his qualifications and testing methods. While the court enjoyed discretion in the admission of expert testimony, it does not appear from the record that the court excluded Mears' testimony on the ground that it was unreliable. In fact, rather than find that such testimony was unreliable, the court admitted portions of Mears' testimony while excluding others. Because the unreliability of the evidence does not appear to have been the basis of the court's ruling, we turn to an analysis of its relevance to the issues at punishment.

Appellant offered Mears' testimony on the issues of sudden passion, future dangerousness, and explaining aspects of Appellant's own life and character. Each of these issues is relevant to a determination of punishment. *See* Tex. Pen.Code Ann. § 19.02(d) (Vernon 1994); Tex.Code Crim. Proc. Ann. art. 37.07, § 3(a) (Vernon Supp.

2000); and *Lopez*, 860 S.W.2d at 946. We hold that the trial court abused its discretion in refusing to admit the testimony of Mears. Having determined that the trial court erred, we next consider whether such error was harmful.

 In harmful error analysis, the appellate court must first decide whether error in a criminal case is constitutional. Tex.R.App. P. 44.2; *Brown v. State*, 960 S.W.2d 265, 271 (Tex.App.—Corpus Christi 1997, no pet.). If error is of constitutional magnitude, the appellate court must reverse unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex.R.App. 44.2(a). Any other error that does not affect substantial rights must be disregarded. Tex.R.App. 44.2(b). Generally, a trial court's error in the exclusion of evidence is non-constitutional. *King v. State*, 953 S.W.2d 266, 271 (Tex.Cr.App.1997). However, the right to present witnesses to establish a defense is a fundamental element of due process. *See Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967); *Brazelton v. State*, 947 S.W.2d 644, 650 (Tex.App.—Fort Worth 1997, no pet.). The right to offer the testimony of witnesses is the right to present the defendant's own version of the facts so that the jury may decide the truth. *Id.* Because the trial court's failure to admit evidence of Appellant's defense is constitutional error, we review that error under the more stringent standard of Rule 44.2(a).

 Rule 44.2(a) requires an appellate court to reverse the trial court's judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex.R.App. P. 44.2(b). Once an appellate court determines that trial court error implicates a substantial right, the reviewing court must consider whether the error adversely affected that right, assessing (1) the source of the error, (2) the nature of the error, (3) whether or to what extent it was emphasized by the State, (4) the probable collateral consequences of the error, (5) how much weight a juror would probably place on the error, and (6) whether declaring the error harmless would encourage the State to repeat it with impunity. *Cooper v. State*, 961 S.W.2d 222, 227 (Tex.App.—Houston [1st Dist.] 1997, pet. ref'd), (citing *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Cr.App.1989)).

In the present case, the source of the error was the trial court's ruling excluding the proffered evidence. That ruling prevented Appellant from explaining his conduct after the commission of the murder. It also precluded Appellant from presenting evidence of sudden passion and adequate cause, matters deemed proper for punishment by the Legislature. Further, the court prevented Appellant's expert from giving his opinion on Appellant's future dangerousness, also properly considered by a jury in the matter of punishment. The most alarming result of the court's exclusionary ruling, however, was that it left unchallenged the State's characterization of Appellant as a cold-blooded killer who could continue his routine affairs as if he had never killed Nugent. From voir dire to closing argument at punishment, the State continuously emphasized this theme. Although it is not the role of this Court to say whether Appellant was indeed the cold killer portrayed by the State, it is the role of the jury, and that body should have had the opportunity to hear Appellant's version of the facts. After reviewing the entire record, this court cannot say that the degree of emphasis placed on Appellant's character by the State, coupled with the trial court's refusal to allow Appellant to rebut this evidence,

did not contribute to the punishment assessed by the jury. Appellant received the absolute maximum sentence allowed by law for the offense of murder, life imprisonment and a $10,000 fine. Because the court is not convinced beyond a reasonable doubt that the trial court's error did not contribute to the punishment verdict, we hold that the error was harmful and sustain Appellant's sixth and seventh points.

In his eighth point, Appellant contends that the court erred in excluding Mears' testimony on rebuttal because the State opened the door through the testimony of its own psychiatric expert. Due to our disposition of points six and seven, it is unnecessary to address point eight.

The judgment of the trial court is reversed as it pertains to punishment, and the case is remanded to the trial court for a new trial on punishment only. *See Levy v. State,* 818 S.W.2d 801, 803 (Tex.Cr.App. 1991) (holding that when an appellate court finds error at the punishment stage, the case may be remanded to the trial court for the proper assessment of punishment only).